Robert Stewart **SHOFNER**

v.

Ann Margaret Kalisz **SHOFNER.**

Court of Appeals of Tennessee,
at Nashville.

Sept. 9, 2004 Session.

Dec. 23, 2004.

Order Denying Petition for Rehearing
Jan. 11, 2005.

Permission to Appeal Denied by
Supreme Court Oct. 24, 2005.

John E. Herbison, Nashville, Tennessee, for the appellant, Ann Margaret Kalisz Shofner.

John J. Hollins, Sr., and James L. Weatherly, Jr., Nashville, Tennessee, for the appellee, Robert Stewart Shofner.

## OPINION

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

This appeal involves an acrimonious dispute over the custody of three children between the ages of eight and twelve. Following a contentious ten-year marriage, the children's parents both sought a divorce and custody of the children in the Circuit Court for Davidson County. The trial judge originally assigned to the case devised a temporary parenting plan that placed the eldest child with his mother and the two youngest children with their father. Thereafter the original trial judge disqualified herself, and the case was assigned to a new trial judge. The newly assigned trial judge declined to revisit her predecessor's custody and support order and eventually entered a final decree (1) declaring the parents divorced in accordance with Tenn.Code Ann. § 36-4-129(b) (2001), (2) approving the parent's marital dissolution agreement, and (3) making the temporary parenting plan permanent. On this appeal, the mother takes issue with the decision to designate the father the primary residential parent of the two youngest children. We have determined that the successor trial judge erred by (1) failing to comply with the requirements of Tenn. R. Civ. P. 63 after the case was reassigned, (2) declining to consider the pending post-trial motions, and (3) refusing to permit the mother to make an offer of proof regarding the circumstances of the children. Despite these serious procedural errors, we have conducted our own independent review of the record and have determined that it contains no factual or legal basis for overturning the parenting plan at this time.

## I.

Ann Margaret Kalisz Shofner (now referred to as "Dr. Kalisz") and Robert Stewart Shofner ("Dr. Shofner") were married in July 1991. Both Dr. Kalisz and Dr. Shofner are physicians. Dr. Shofner is a practicing ophthalmologist, and Dr. Kalitz is an internist. They had three children during their marriage—Robert born in 1992, Alyssa born in 1994, and Andrew born in 1996. Dr. Kalisz stopped practicing medicine after Alyssa was born to devote her full-time attention to the parties' children.

All was not well in the Shofner–Kalisz family despite the advantages that accompany professional educations and financial success. The marriage was fraught with marital conflict, as well as physical and emotional abuse. Dr. Kalisz insists that Dr. Shofner had difficulty managing his anger, that he physically and mentally abused her and Robert, and that he was, at times, rough with the younger children. She also asserts that Dr. Shofner had a serious gambling addiction.[1] Dr. Shofner admits to acting inappropriately with Dr. Kalisz and Robert but disagrees with the

---

1. The record indicates that at one time, Dr. Shofner lost over $400,000. Dr. Shofner ad- mitted his addiction and has sought professional help to address it.

characterization that his conduct was abuse.[2] Drs. Kalisz and Shofner also had diametrically opposite views with regard to disciplining their children. Dr. Shofner favored physical punishment, while Dr. Kalisz favored rewarding good behavior and taking away privileges for bad behavior.

Dr. Shofner insists that much of the family discord stemmed from Robert's physical abuse of Alyssa and Dr. Kalisz's consistent refusal to discipline Robert when he misbehaved or to protect Alyssa from Robert. Robert has a history of inflicting severe physical abuse on Alyssa, including hitting her, pushing her down stairs, and at one point, knocking her over, causing her to break her arm. Despite Robert's behavioral problems at school and in other social settings, Dr. Kalisz reacted defensively and angrily when the children's teachers, physicians, relatives, and friends tried to offer her advice or criticism about her parenting. She eventually developed strained relations with most of the family's support group. At the slightest hint of disapproval or concern, Dr. Kalisz moved the children from one school to another or withdrew them from various activities. She also refused to follow school rules, and she caused the children, especially Alyssa, to be excessively absent from school.

In other circumstances, conduct of the sort occurring in the Shofner–Kalisz home would have prompted intervention by the Tennessee Department of Children's Services to protect the children.[3] It may very well have been the parents' socioeconomic status that enabled them to avoid a referral and thereby permitted the domestic dysfunction to continue for far too long. Finally, in April 2001, after ten years of confrontation, abuse, and discord, Dr. Shofner filed suit in the Circuit Court for Davidson County seeking a divorce on the grounds of irreconcilable differences and inappropriate marital conduct. He also sought to be designated as the children's primary residential parent. Dr. Kalisz responded with a counterclaim for divorce and also sought to be designated the children's primary residential parent.

At first, Dr. Kalisz, Dr. Shofner, and their children continued to reside in the marital home. During this time, the trial court required Dr. Shofner to pay child support and spousal support to Dr. Kalisz. In November 2001, after the living arrangements proved unworkable, the trial court ordered Dr. Shofner to leave the marital home pending a final hearing. The trial court granted Dr. Shofner liberal visitation and ordered him to be responsible for taking Alyssa and Andrew to school each morning. The court also ordered Dr. Kalisz to take Robert to school each morning and to pick up all three children from school in the afternoon.

The trial court conducted four days of custody hearings between July and August 2002. These hearings provided both Dr. Kalisz and Dr. Shofner with an opportunity to complain about the difficulties they had experienced with the temporary custody arrangement[4] and to inveigh against

2. Dr. Kalisz asserted, for example, that Dr. Shofner "kicked" her in anger. Dr. Shofner characterized this conduct thusly: "I gave her a pat with my foot on her derriere.... [I]t wasn't a kick. A kick to me is what you do to a football fifty yards."

3. Recounting in detail all the evidence regarding the parties' conduct both before and after their separation serves no useful purpose. We have included in this opinion only those specific incidents necessary to illustrate or support our reasoning.

4. This testimony did not reflect well on either parent. Dr. Shofner, for example, complained that Dr. Kalisz frequently would not have the two younger children ready for

each other's parental shortcomings during the marriage. Dr. Kalisz described how Dr. Shofner had neglected the children when she was absent and insisted that he lacked the knowledge, ability, or inclination to care for the children. She testified in graphic detail about the injuries she and Robert received at Dr. Shofner's hands.

In his own defense, Dr. Shofner conceded that he had previously relied too heavily on physical punishment and that he had been unable to care for the children on his own. He also stated that he had heeded the recommendations and advice of the children's teachers and physicians and that he now believed that physical punishment was not an appropriate way to discipline children. He also testified that he had hired a nanny to assist him with the children. While Dr. Shofner exhibited genuine concern for the children's welfare and a desire to improve his parenting skills, he was extremely critical of Dr. Kalisz's adamant refusal to accept any help or advice from the children's teachers, physicians, and others interested in the children's welfare. He described numerous instances of Dr. Kalisz's disagreeing with practically everyone involved with the children's lives.

The trial court also received the testimony of Dr. Elmer Ray Potts, a psychologist who had been appointed by the court to evaluate both the parents and the children. Dr. Potts had interviewed and evaluated all members of the family and had prepared detailed reports regarding each member.[5] Dr. Potts concluded that both Dr. Kalisz and Dr. Shofner were extremely defensive and overly cautious about their

own faults and that both parents always believe that they are right. He credited Dr. Shofner with admitting that he needed outside help and support. Dr. Potts also diagnosed both Dr. Kalisz and Dr. Shofner with personality disorders. He concluded that while these disorders did not necessarily mean that they did not possess adequate parenting skills, they played a large role in the dysfunctional family relationships. Dr. Potts also detailed the negative effects that Dr. Shofner's and Dr. Kalisz's dysfunctional relationship has had on their children and strongly recommended that all the children receive counseling.

On September 19, 2002, the trial court filed a 16–page memorandum opinion and an order limited to the custody of the children.[6] The court relied heavily on Dr. Potts's reports and testimony. The court determined that the children had been trained to be dysfunctional by living with Drs. Shofner and Kalisz and that it could possibly be dangerous to require the children to continue to live together in light of the evidence of Robert's abuse of Alyssa. Accordingly, the court concluded that the children should be separated. Based on its understanding of the children's preferences, the trial court determined that Dr. Kalisz would be Robert's primary residential parent and that Dr. Shofner would be Alyssa's and Andrew's primary residential parent. It prepared a detailed parenting plan for this arrangement that included visitation for both parents. The court also ordered Dr. Shofner to continue to pay spousal support and child support for Robert.[7] Finally, the court determined that

---

school when he arrived in the morning. For her part, Dr. Kalisz complained that Dr. Shofner would ring the door bell incessantly while waiting for her to get the children ready for school.

5. No useful purpose would be served by recounting the details of Dr. Potts's evaluations in this opinion.

6. The court deferred ruling on the other issues in the case until a later date.

7. The trial court directed Dr. Kalisz to "spend

"[t]his arrangement will be reviewed in May 2003."[8]

Following the entry of the trial court's memorandum opinion and order, Dr. Kalisz filed several post-trial motions, including an amended Tenn. R. Civ. P. 59.04 motion. However, before the trial court could address these motions, Dr. Kalisz moved to disqualify the trial judge based on derogatory characterizations of her appearing in the judge's personal notes, which had been placed inadvertently in the official case file. Following a hearing in November 2002, the trial judge declined to recuse herself but granted Dr. Kalisz permission to file a Tenn. R.App. P. 9 application for an interlocutory appeal with this court. On December 3, 2002, this court granted the interlocutory appeal, reversed the trial judge's denial of the recusal motion, and remanded the case with directions that it be reassigned to another trial judge.[9] On remand, the original trial judge recused herself and was replaced by a successor trial judge.

In February 2003, Dr. Kalisz filed a motion to vacate the September 19, 2002 memorandum order and opinion regarding custody and to grant her custody of the children pending a final hearing. On March 11, 2003, the successor trial judge denied the motion because the original trial judge had already addressed the issues regarding child custody and support. Several weeks later, Dr. Kalisz's attorneys withdrew and were replaced by a lawyer practicing in Memphis. In April 2003, Dr. Kalisz requested the trial court to set a hearing to review the parenting plan established by the September 19, 2002 memorandum opinion and order.

On June 10, 2003, the successor trial judge addressed all the remaining issues in the divorce case, including Dr. Kalisz's motion to review the existing parenting plan. She declared the parties divorced pursuant to Tenn.Code. Ann. § 36–4–129(b) based on their written stipulation that they had both engaged in inappropriate marital conduct. In addition, she approved the parties' marital dissolution agreement that resolved all the financial issues. However, the successor trial judge refused to consider Dr. Kalisz's Tenn. R. Civ. P. 59.04 motion or her motion to review the parenting plan because the September 19, 2002 order was not her order.[10] She also refused to per-

at least 10 hours per week in either part-time employment, education or significant volunteer activity" because she was now only responsible for Robert. The court also expressed its hope "that she [Dr. Kalisz] will eventually retain at least part-time employment or full-time employment in her chosen profession. That will be discussed at a later hearing or at the review hearing in May 2003."

8. The order reflects that this arrangement was by no means the final word with regard to custody. The trial court observed:

If the court sees progress in both of these parents as learning good parenting skills, the court will readily consider, whether the economy of the family is better served by the three children being together with Ms. Dr. Shofner or continuing to live separately. By the same token, if Ms. Dr. Shofner and Robert do not do well together, the court may consider placing all three children with Dr. Shofner or some alternative plan.

9. We based this decision on our conclusions that the trial judge's characterization of Dr. Kalisz created an appearance of bias and that nothing could erase the parties' perception of bias created by the content of the trial judge's notes that had been inadvertently revealed to them. *Shofner v. Shofner*, No. M2002–02803–COA–R9–CV (Tenn.Ct.App. Dec. 3, 2002).

10. Apparently, the successor trial judge had an ex parte communication with Dr. Kalisz's lawyer's paralegal prior to the hearing in which she stated that she would not allow Dr. Kalisz's lawyer to proceed with this motion. According to the transcript of the June 10, 2003 hearing, the successor trial judge and

mit Dr. Kalisz to make an offer of proof with regard to her motion to review the parenting plan.[11] The trial court entered a final decree immediately following the hearing.

Dr. Kalisz perfected an appeal to this court. The appeal did not, however, bring a respite to the parties' legal skirmishes. Their internecine warfare continued in other forums. While the appeal was pending, Dr. Shofner requested the trial court to order Dr. Kalisz to pay child support and to restrain her from interfering with his parenting. Dr. Kalisz responded by requesting the trial court to modify the parenting plan that was the subject of this appeal. Following a hearing, the trial court ordered Dr. Kalisz to pay child support for Alyssa and Andrew and restrained her from interfering with Dr. Shofner's parenting efforts. The court also denied Dr. Kalisz's motion to modify the parenting plan on the ground that no material change in the parties' or the children's circumstances had occurred.

Thereafter, Dr. Kalisz filed a verified petition in the Davidson County Juvenile Court seeking to have Alyssa and Andrew declared dependent and neglected children. Both a referee and the juvenile judge dismissed Dr. Kalisz's petition because it dealt with the "same issues ... [that] are presently part of pending litigation in another Court." Dr. Kalisz appealed the denial of her petition to the circuit court. When the case was assigned to the successor trial judge, Dr. Kalisz requested the trial judge to recuse herself. After the successor trial judge declined to step aside, Dr. Kalisz voluntarily dismissed her appeal from the juvenile court's decision.[12]

## II.

### THE SUCCESSOR TRIAL JUDGE'S COMPLIANCE WITH TENN. R. CIV. P. 63

We turn first to Dr. Kalisz's argument that the successor trial judge erred by failing to comply with Tenn. R. Civ. P. 63 when the case was assigned to her following the recusal of the original trial judge. Dr. Shofner defends the successor trial judge by arguing that her oversight should be excused because Dr. Kalisz did not ask her to comply with Tenn. R. Civ. P. 63. Dr. Kalisz has the better argument.

---

Dr. Kalisz's lawyer had the following exchange:

MS. POUNDERS: I had filed earlier a motion for review which was referenced in the memorandum of opinion of Judge Shipley, i.e., of review of the three children who are now ages 11, 9, and 6. And pursuant to my understanding, Your Honor contacted my office, spoke with my paralegal. You and I never had a conversation about it. I want the record to be clear about the status of this.

THE COURT: Right.

MS. POUNDERS: I then spoke to someone in your office and understood that Your Honor was not going to allow me to proceed on that motion.

THE COURT: Right. We can do the motion today. But what my information was, was that I would not grant that motion, that since Judge Shipley recused herself, that was not my order, and I would not do the review. And so that's most respectfully denied, if you're making that motion to me today, and that can be part of the record.

11. Dr. Kalisz's lawyer requested "that there at least be an offer of proof from my client in regard to her understanding of the status of the children presently." The trial court responded, "That's most respectfully denied, but you can address that with the Court of Appeals."

12. We granted Dr. Shofner's Tenn. R.App. P. 14 motion to include the information regarding the post-appeal proceedings in the trial court and the juvenile court. Dr. Kalisz also filed a Tenn. R.App. P. 14 motion requesting this court to consider other criminal proceedings she commenced against Dr. Shofner. We have denied this motion.

Trial courts have a duty to comply with Tenn. R. Civ. P. 63 when the circumstances require, and the successor trial judge erred by failing to discharge her duty.

## A.

Tenn. R. Civ. P. 63 governs situations when a case must be assigned to another judge because the judge originally presiding over the case is unable to proceed. The rule provides:

> If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties. In a trial or hearing without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. In any trial or hearing, with or without a jury, the successor judge may recall any witness.

Tennessee's courts have not had many occasions to construe Tenn. R. Civ. P. 63. However, its language is essentially identical to that of Fed.R.Civ.P. 63. Accordingly, the decisions of the federal courts construing Fed.R.Civ.P. 63 can provide helpful guidance in interpreting our own rule. *See Frazier v. East Tenn. Baptist Hosp.*, 55 S.W.3d 925, 929 (Tenn.2001); *Harris v. Chern*, 33 S.W.3d 741, 745 n. 2 (Tenn.2000); *Pacific Eastern Corp. v.*

*Gulf Life Holding Co.*, 902 S.W.2d 946, 952 n. 7 (Tenn.Ct.App.1995).

Both the state and the federal versions of Rule 63 apply to situations in which a trial judge is, for some reason, unable to proceed in a case. These situations include disqualification or recusal. The newly assigned judge must either certify familiarity with the record and determine that the proceedings may continue without prejudice to the parties or grant a new trial.[13] The successor judge may not proceed in a case without making the requisite certifications.[14] As the 1991 Advisory Committee Note to Fed.R.Civ.P. 63 states:

> To avoid the injustice that may result if the substitute judge proceeds despite unfamiliarity with the action, the new Rule provides, in language similar to Federal Rule of Criminal Procedure 25(a), that the successor judge must certify familiarity with the record and determine that the case may be completed before that judge without prejudice to the parties.

The advisory committee's note further states that the successor judge's certification is an "efficient mechanism" to prevent the unnecessary expense and delay of a second trial. A successor judge need only certify familiarity with those portions of the record that relate to issues before the judge. *Canseco v. United States*, 97 F.3d 1224, 1227 (9th Cir.1996). As long as the successor judge certifies familiarity with the record and determines that continuing the proceedings may be accomplished without prejudice to the parties, the judge may carry on the duties of the original

---

**13.** 12 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 63.04 (3d ed. 1998) ("MOORE'S FEDERAL PRACTICE") ("To certify familiarity with the record, a successor judge must read and consider all relevant portions of the record.").

**14.** 12 MOORE'S FEDERAL PRACTICE § 63.04 ("Before succeeding a judge who is unable to proceed, a successor judge must certify familiarity with the record and determine that the proceedings may be completed before the successor judge without prejudice to the parties.").

judge with wide-ranging power and with the same discretion as the original judge.[15]

### B.

This record contains no indication that the successor trial judge ever certified her familiarity with the record of the proceedings that had occurred before the original trial judge. Dr. Shofner seeks to excuse this oversight by arguing that Dr. Kalisz waived her right to insist on compliance with Tenn. R. Civ. P. 63 because she failed to request the trial court to make the required certification. This argument overlooks the fact that there is no room for discretion regarding compliance with Tenn. R. Civ. P. 63. The plain language of the rule demonstrates that it applies to all cases in which a successor trial judge replaces a trial judge who is unable to proceed. Accordingly, the successor trial judge had a duty to comply with Tenn. R. Civ. P. 63 whether requested to do so or not. It necessarily follows that she erred by presiding over the case without either ordering a retrial or certifying that she was familiar with the record of the prior proceeding and that continuing the proceeding without a retrial would not prejudice the parties.

### III.

#### The Successor Trial Judge's Refusal to Consider the Custody Issue

Dr. Kalisz also takes issue with the trial court's categorical refusal to revisit the 2002 parenting plan because it had been devised by the original trial judge. She argues that the successor trial judge erred by (1) considering the original trial judge's September 19, 2002 order to be beyond review or reconsideration, (2) refusing to rule on the Tenn. R. Civ. P. 59.04 motion

she had filed before the original trial judge recused herself, and (3) refusing to permit her to make an offer of proof at the June 10, 2003 hearing regarding the current status of the children. Again, we agree with Dr. Kalisz on all points.

### A.

The successor trial judge decided that she would not consider or review the original trial judge's September 19, 2002 parenting plan because it was "final." Dr. Kalisz takes issue with the successor trial judge's characterization because the original trial judge had stated that she would review the parenting plan again in May 2003. Dr. Shofner responds that reserving the right to review the parenting plan does not undermine the plan's finality. While Dr. Shofner is correct, both parties' focus on the legal significance of the original trial judge's intention to revisit the parenting plan misses the point. The September 19, 2002 order was not final for two simple reasons. First, it did not resolve all the claims between all the parties. Second, the original trial judge did not certify it as final in accordance with Tenn. R. Civ. P. 54.02.

A final judgment is primarily one that fully adjudicates all the claims between all the parties. Tenn. R.App. P. 3(a); *Aetna Cas. & Sur. Co. v. Miller*, 491 S.W.2d 85, 86 (Tenn.1973); *Wilson v. Wilson*, 58 S.W.3d 718, 725 (Tenn.Ct.App. 2001); *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 n. 4 (Tenn.Ct.App.1996). It leaves nothing else for the trial court to resolve. *In re Estate of Henderson*, 121 S.W.3d 643, 645 (Tenn.2003); *Vineyard v. Vineyard*, 26 Tenn.App. 232, 241, 170 S.W.2d 917, 920 (1942). Until a judgment be-

---

**15.** *See* 12 Moore's Federal Practice § 63.05; *see also United States v. Diehl*, 460 F.Supp. 1282 (S.D.Tex.1978).

comes final, it remains within the trial court's control and may be modified any time prior to the entry of a final judgment. *Stidham v. Fickle Heirs*, 643 S.W.2d 324, 328 (Tenn.1982); *Eldridge v. Eldridge*, 137 S.W.3d 1, 20 n. 10 (Tenn.Ct.App.2002); *Hall v. Bookout*, 87 S.W.3d 80, 85 (Tenn.Ct.App.2002).

██ A judgment that does not resolve all the claims between all the parties may nevertheless be considered a final judgment if the trial court certifies it as final in accordance with Tenn. R. Civ. P. 54.02. A judgment that completely resolves one of multiple claims or that completely resolves all the claims against one of multiple parties is eligible for certification under Tenn. R. Civ. P. 54.02. *Bayberry Assocs. v. Jones*, 783 S.W.2d 553, 558 (Tenn.1990); *Town of Collierville v. Norfolk Southern Ry.*, 1 S.W.3d 68, 70 (Tenn.Ct.App.1998). However, finality arises only when the trial court has expressly directed the entry of a final judgment because no just reason for delaying the entry of a final judgment exists.

The September 19, 2002 memorandum opinion and order clearly did not resolve all the disputed matters in the pending divorce litigation. By their own terms, they dealt with only one matter—custody of the children. Accordingly, the order can be deemed final only if it contains the express determination required by Tenn. R. Civ. P. 54.02 that there is no just reason for delaying the entry of a final judgment regarding the custody issue. The order does not contain such a determination. Therefore, despite the successor trial judge's apparent distaste for addressing an issue already addressed by the original

trial judge, the September 19, 2002 order is not final. In the words of Tenn. R. Civ. P. 54.02, it remained "subject to revision at any time before the entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties."

Both parties' briefs contain lengthy discussions regarding the significance of the portion of the September 19, 2002 memorandum opinion stating that the trial court intended to revisit the parenting plan in May 2003. Dr. Kalisz asserts that this language means that the parenting plan was not "final." Dr. Shofner takes the contrary position. On two occasions, this court has determined that a statement in a divorce decree reflecting the court's intention to review the custody arrangement at a later date does not undermine the finality of the decree.[16] These opinions have no relevance to this case because they involved divorce decrees that disposed of all the claims between all the parties. The September 19, 2002 order did not; it addressed only the custody issue.

**B.**

██ Dr. Kalisz also takes issue with the successor trial judge's refusal to consider the amended Tenn. R. Civ. P. 59.04 motion that was filed before the original trial judge recused herself. She insists that the successor trial judge stepped into the shoes of the original trial judge and was required to consider any motions the original judge would have been required to consider. We agree.

██ While trial courts enjoy wide discretion to grant or deny Tenn. R. Civ. P. 59 motions, *Ali v. Fisher*, 145 S.W.3d 557, 564–65 (Tenn.2004), they cannot refuse to

16. *Hoalcraft v. Smithson*, 19 S.W.3d 822, 827–28 (Tenn.Ct.App.1999) (a trial court's statement that it would place the custody arrangement on its "review docket" did not undermine the finality of the order); *Dailey v.* *Dailey*, No. 03A01–9409–CH–00340, 1995 WL 11179, at *3 (Tenn.Ct.App. Jan.12, 1995) (a trial court's characterization of a custody decision as "temporary" did not undermine the finality of the order).

exercise that discretion. Thus, because Tenn. R. Civ. P. 63 requires the successor trial judge to step into the shoes of the original trial judge, the successor trial judge must consider and resolve any post-trial motions that the original trial judge would have been required to consider. *Rogers Group, Inc. v. Anderson County,* 113 S.W.3d 725, 727 (Tenn.Ct.App.2003). As one court construing Fed.R.Civ.P. 63 has observed, "[i]t would be unfair to 'deny a litigant's right to try to persuade the court that it has erred simply because the judge who rendered the original decision is unavailable and cannot be called on to reconsider the matter.'" *Mergentime Corp. v. Washington Metro. Area Transit Auth.,* 166 F.3d 1257, 1263 (D.C.Cir.1999) (quoting 12 MOORE'S FEDERAL PRACTICE § 63.05[1]).

■ The decisions construing Tenn. R. Civ. P. 63 and its federal counterpart make it clear that if a successor trial judge decides to permit a legal proceeding to continue, the judge must consider and dispose of any post-trial motions made either before or during the successor judge's involvement in the case. If the successor judge is satisfied that he or she cannot perform the duties imposed by the procedural rules with respect to the particular case, the successor judge is empowered to and must order a new trial. See 12 MOORE'S FEDERAL PRACTICE § 63.05. When the successor trial judge in this case decided that a new trial would not be necessary, she assumed the original trial judge's obligation to consider Dr. Kalisz's outstanding Tenn. R. Civ. P. 59.04 motion and erred when she refused to consider it.

### C.

■ The final procedural issue raised by Dr. Kalisz involves the successor trial judge's refusal to permit her to make an offer of proof at the June 10, 2003 trial regarding the current circumstances of the children. Dr. Shofner does not undertake to defend the successor trial judge's action-with good reason. The trial court committed clear error by preventing Dr. Kalisz from making an offer of proof regarding the children's circumstances in June 2003.

As a matter of law, the custody arrangements for the parties' three children remained an open question at the June 10, 2003 hearing. Because the custody decision was not yet final and nine months had elapsed since the entry of the initial custody order, any evidence regarding the children's current circumstances was relevant, and the successor trial judge should have permitted either Dr. Kalisz or Dr. Shofner to present any evidence they had regarding this matter. Even after it decided not to hear any evidence regarding the custody issue, the trial court should have permitted the parties to make an offer of proof. Tenn. R. Evid. 103(a)(2); *Alley v. State,* 882 S.W.2d 810, 815 (Tenn.Crim. App.1994).

■ A trial court's decision to exclude evidence is not prejudicial unless it affects a party's substantial rights. *See* Tenn. R. Evid. 103(a). The exclusion of evidence regarding the custody of minor children when the matter of custody is not finally resolved and the custody arrangement is still subject to revision affects not only the rights of the parents but also the interests of the children. Children of divorcing and divorced parents are entitled to protection by the courts, and the courts must look out for their interests.[17] Courts

---

17. *See Smith v. Smith,* 188 Tenn. 430, 437–38, 220 S.W.2d 627, 630 (1949); *Rubin v. Kirshner,* 948 S.W.2d 742, 747 (Tenn.Ct.App.1997); *State ex rel. Norfleet v. Dobbs,* No. 01A01–9805–CV–00228, 1999 WL 43260, at *4

cannot effectively discharge their obligation to look out for the interests of children of divorcing parents when they arbitrarily decline to consider the children's present circumstances before fashioning a final custody arrangement.[18]

The successor trial judge's refusal to permit a timely offer of proof also undermines this court's ability to determine not only whether the trial court properly excluded the evidence but also whether the parenting plan is in the children's best interests. By inviting Dr. Kalisz to raise the issue with the denial of her offer of proof on appeal, the successor trial judge has effectively forced us to travel to an unknown destination without a map. Despite the voluminous record in this case, it is not possible for us to ascertain the status of the children at the time of the June 2003 hearing. The successor trial judge erred when she refused Dr. Kalisz's request to make an offer of proof.

## IV.

### THE EXISTING CUSTODY ARRANGEMENT

■ The principal substantive issue in this case is the propriety of the custody arrangement that has been in place for over two years. Dr. Kalisz asserts that the portion of the September 19, 2002 order placing Alyssa and Andrew in Dr. Shofner's custody is not in their best interests because Dr. Shofner is unfit to be the children's primary custodial parent. Having carefully reviewed the voluminous record, we determined that it does not contain sufficient evidence to warrant overturning the existing custody arrangement.

(Tenn.Ct.App. Feb.1, 1999) (No Tenn. R.App. P. 11 application filed).

18. Parents do not have the right to importune the courts with constant updates regarding the minor details of a child's day-to-day exis-

We note at the outset of our discussion of this issue that the successor trial judge's procedural errors discussed in Section III of this opinion have effectively placed important and relevant evidence beyond our reach. At the time of the final hearing in this case in June 2003, the custody arrangement at issue on this appeal had been in place for approximately nine months. As a result of the successor trial judge's refusal to permit Dr. Kalisz to make an offer of proof, this record contains no evidence regarding the effect the custody arrangement had had on the children up to that point. It would serve no practical purpose to remand the case to supply the evidence that should have been introduced in June 2003. That evidence is now dated, and the parties would be hard-pressed to present it. Despite our knowledge that much has transpired during the past two years, we have determined that the most appropriate course is to review the propriety of the existing custody arrangement in light of the record as it has been provided to us.

### A.

■ Creating a parenting plan is one of the most important decisions confronting a trial court in a divorce case. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct.App.2001). Courts must strive to devise parenting plans that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making. *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn.1996); *Taylor v. Taylor*, 849 S.W.2d 319, 331–32 (Tenn.1993). The needs of the children are paramount; the

tence or with trivial complaints regarding the other parent. Accordingly, the courts may condition a parent's request to present evidence regarding a child's circumstances on a prior showing of relevancy and purpose.

desires of the parents are secondary. *Lentz v. Lentz,* 717 S.W.2d 876, 877 (Tenn. 1986). Parenting plans should never be used to punish or reward the parents for their human frailties or past mis-steps, *Earls v. Earls,* 42 S.W.3d 877, 885 (Tenn. Ct.App.2000); *Turner v. Turner,* 919 S.W.2d 340, 346 (Tenn.Ct.App.1995); *Long v. Long,* 488 S.W.2d 729, 733 (Tenn.Ct. App.1972), but rather they should be used to advance the children's best interests by placing them in an environment that best serves their physical and emotional needs. *Luke v. Luke,* 651 S.W.2d 219, 221 (Tenn. 1983).

There are no hard and fast rules for devising a parenting plan. *See Taylor v. Taylor,* 849 S.W.2d at 327; *Dantzler v. Dantzler,* 665 S.W.2d 385, 387 (Tenn.Ct. App.1983). The process is factually driven and requires the courts to carefully weigh numerous considerations. *Nichols v. Nichols,* 792 S.W.2d 713, 716 (Tenn.1990); *Rogero v. Pitt,* 759 S.W.2d 109, 112 (Tenn. 1988). The Tennessee General Assembly and the courts have identified many of the factors that trial courts should consider. Tenn.Code Ann. § 36–6–106(a) (2001); Tenn.Code Ann. § 36–6–404(b) (Supp. 2004); Tenn.Code Ann. § 36–6–406(d) (2001); *Bah v. Bah,* 668 S.W.2d 663, 666 (Tenn.Ct.App.1983).

 Trial courts have broad discretion to fashion parenting plans that best serve the interests of the children. Tenn. Code Ann. § 36–6–101(a)(2)(A) (Supp. 2004). They must, however, base their decisions on the evidence presented to them and upon the proper application of the relevant principles of law. *D v. K,* 917 S.W.2d 682, 685 (Tenn.Ct.App.1995). While we are reluctant to second-guess a trial court's decisions regarding a parenting plan, *see Adelsperger v. Adelsperger,* 970 S.W.2d 482, 485 (Tenn.Ct.App.1997), we will not hesitate to do so if we conclude that the trial court's decision is not supported by the evidence, that the trial court's decision rests on an error of law, or that the child's interests will be best served by another parenting arrangement. *Eldridge v. Eldridge,* 42 S.W.3d 82, 85 (Tenn.2001); *Steen v. Steen,* 61 S.W.3d at 328; *Placencia v. Placencia,* 3 S.W.3d 497, 499 (Tenn.Ct.App.1999).

### B.

Dr. Kalisz first asserts that she is comparatively more fit than Dr. Shofner to be the primary residential parent for all three children. She compares her self-described accomplishments as a parent with Dr. Shofner's inappropriate conduct during the marriage. Dr. Shofner reciprocates by emphasizing the efforts he has made to be a better parent along with Dr. Kalisz's own inappropriate behavior and resistance to change.

As we have reviewed the record in this case, we have kept in mind that these parents, like all parents, have their own strengths and weaknesses. *Gaskill v. Gaskill,* 936 S.W.2d at 630. It would be unrealistic to measure them against the standard of perfection because, in reality, this standard is unattainable. *Earls v. Earls,* 42 S.W.3d at 885; *Rice v. Rice,* 983 S.W.2d 680, 682–83 (Tenn.Ct.App.1998). The evidence in this case underscores the shortcomings of both parents. They have not always used proper judgment, and they have frequently failed to act in the best interests of their children. In fact, no conclusion can be drawn from the evidence other than that Dr. Shofner's and Dr. Kalitz's inabilities to maintain a civil relationship with each other has severely disrupted their children's lives and has affected their children in ways that may not be fully realized for many years.

The record clearly shows that the children are Dr. Kalisz's first priority. She is

motivated by a commendable desire to nurture and protect her children from the vagaries of the world. Yet, paradoxically, Dr. Kalisz has been unwilling or unable to realize that many of her parenting strategies have proved to be ineffective and actually detrimental to her children. She has reacted defensively and hostilely to the advice and suggestions of persons who are concerned about the children's welfare, including their teachers, physicians, and family members. Her inability to appreciate how her conduct has affected the parties' children is troubling.

Dr. Shofner also has many shortcomings. Some of his conduct during the marriage is inexcusable, and his parenting strategies, especially his early penchant for physical discipline, have proved to be ineffective and counterproductive. However, unlike Dr. Kalisz, Dr. Shofner has admitted his shortcomings and has been actively seeking outside assistance to improve his parenting skills and to assist him with his parenting responsibilities. He has hired a nanny; he has received parenting skill training; and he has elicited and followed the advice from the children's teachers and physicians.

We have compared the fitness of both Dr. Kalisz and Dr. Shofner to parent their children based on the evidence in the record. While we find troubling drawbacks with both parents, we have not found evidence indicating that either parent is unfit to be a primarily residential parent or that Dr. Kalisz is comparatively more fit than Dr. Shofner to be Alyssa's and Andrew's primary residential parent. In fact, the record shows that Dr. Shofner has demonstrated a genuine desire to be a better parent, while Dr. Kalisz has refused to recognize her own shortcomings or the effects that these shortcomings have had on all her children. Accordingly, we have concluded that the evidence does not support Dr. Kalisz's claim that she is comparatively more fit than Dr. Shofner to be Alyssa's and Andrew's primary residential parent.

## C.

Dr. Kalisz also insists that the September 19, 2002 order must be set aside because it requires that Robert be separated from Alyssa and Andrew. She asserts that separating siblings is inherently harmful and that the children's interests would be best served by allowing them to live together with her. While we agree that siblings should ordinarily not be separated, this case is one of the relatively rare exceptions to that rule.

■ Separating siblings is a drastic remedy. While there is a presumption against separating siblings, *Ray v. Ray*, 83 S.W.3d 726, 738 (Tenn.Ct.App.2001); *Baggett v. Baggett*, 512 S.W.2d 292, 293–94 (Tenn.Ct.App.1973), this presumption is rebuttable and must give way to other considerations in appropriate circumstances. *Rice v. Rice*, 983 S.W.2d at 684. The facts in a particular case may require that siblings be separated. *Ray v. Ray*, 83 S.W.3d at 726; *In re S.B.*, No. M1999–00140–COA–R3–CV, 2000 WL 575934, at *5 (Tenn.Ct.App. May 12, 2000) (No Tenn. R.App. P. 11 application filed); *Mills v. Mills*, No. 02A01–9711–CV–00295, 1998 WL 802011, at *4 (Tenn.Ct.App. Nov.18, 1998) (No Tenn. R.App. P. 11 application filed).

The record contains troubling information regarding Robert's aggressive conduct and Dr. Kalisz's inability or disinclination to control it. Robert has committed a series of violent acts on Alyssa. He has struck her on many occasions; he has pushed her down two separate staircases at their grandmother's house; and he caused her to break her arm. No court in good conscience could permit Robert and

Alyssa to live together under these facts in the absence of a cohesive plan to address Robert's aggressiveness and to prevent future abuse of his sister. No such plan is evident in this record. Dr. Kalisz prefers to allow the children to work out their problems, while Dr. Shofner advocates punishing Robert for his behavior. Until Dr. Shofner and Dr. Kalisz can agree to participate in a plan that protects Alyssa and assures that Robert can control his aggressive conduct, it is in both Robert's and Alyssa's best interests that they live in separate households.

Robert is clearly dependent on Dr. Kalisz and has expressed his preference to live with her rather than with Dr. Shofner. This desire is understandable in light of the manner in which Dr. Shofner has physically disciplined Robert in the past and the resulting deterioration of their relationship. Accordingly, the evidence supports designating Dr. Kalisz as Robert's primary residential parent and Dr. Shofner as Alyssa's primary residential parent.

■ According to Dr. Potts, Andrew, the parties' youngest child, is the "best survivor of this dysfunctional group." Although he is only eight years old, Andrew has expressed a preference to live with Dr. Shofner. It was appropriate for the trial court to consider Andrew's preference along with the other factors relevant to devising a parenting plan. Tenn.Code Ann. § 36–6–106(a)(7) (2001); *Helson v. Cyrus*, 989 S.W.2d 704, 707 (Tenn.Ct.App. 1998). The record contains no evidence that Dr. Shofner has abused Andrew. At the same time, the record contains evidence that Andrew has a close relationship with Alyssa. In light of these facts, we decline to second-guess the decision to permit Andrew to live with Alyssa and to designate Dr. Shofner has his primary residential parent.

■ When courts are required to separate siblings, they should minimize the potentially harmful effects of this separation by including liberal visitation rights and other provisions enabling and encouraging the siblings to continue their relationship with each other. *Ray v. Ray*, 83 S.W.3d at 738; *Rice v. Rice*, 983 S.W.2d at 685. The parenting plan contained in the September 19, 2002 order allows for the children to spend every weekend together and grants both Dr. Kalisz and Dr. Shofner liberal visitation rights. Taking into consideration the overriding need to protect Alyssa from Robert until he demonstrates that he is better able to control his aggression, the parenting plan accomplishes the goal of enabling the siblings to maintain their relationship with each other as much as the circumstances will permit.

**D.**

The fact that the parenting plan at issue in this case has been in place since September 2002 has influenced our analysis of the issues in this case. Children have the best opportunity to thrive when they live in stable environments. Tenn.Code Ann. § 36–6–401(a) (2001); *Aaby v. Strange*, 924 S.W.2d at 627; *Gorski v. Ragains*, No. 01A01–9710–GS–00597, 1999 WL 511451, at *4–5 (Tenn.Ct.App. July 21, 1999) (No Tenn. R.App. P. 11 application filed); National Interdisciplinary Colloquium on Child Custody, *Legal and Mental Health Perspectives on Child Custody Law: A Deskbook for Judges* § 5:1, at 51 (1998). As a result of the current parenting plan, the children caught up in the dispute between Drs. Shofner and Kalisz have at least had some measure of stability.

Our decision in this case is a narrow one. We have not decided that some other parenting plan would not have been more appropriate in 2003 had the trial court considered additional evidence regarding

the children's circumstances at that time. Nor have we foreclosed the possibility of altering the current parenting plan should either party present evidence of a material change in circumstance warranting an alteration. We have determined only that the present record does not support Dr. Kalisz's assertion that the 2002 parenting plan is not in the best interests of the parties' children.

## V.

DR. SHOFNER'S CLAIM FOR ATTORNEY'S FEES

█ Dr. Shofner has requested that this court award him a judgment against Dr. Kalisz for the legal fees and costs he has incurred on this appeal. Tenn.Code Ann. § 36–5–103(c) (Supp.2004) vests in this court the discretionary authority to award these fees and costs in proper cases. *See Holt v. Holt,* 995 S.W.2d 68, 78 (Tenn. 1999); *Archer v. Archer,* 907 S.W.2d 412, 419 (Tenn.Ct.App.1995). In determining whether an award for attorney's fees is warranted, we should consider, among other factors, the ability of the requesting party to pay his or her own attorney's fees, the requesting party's success on appeal, and whether the requesting party has been acting in good faith. *Parchman v. Parchman,* No. W2003–01204–COA–R3–CV, 2004 WL 2609198, at *6 (Tenn.Ct.App. Nov.17, 2004).

█ While Dr. Kalisz's decision to seek relief in many different courts simultaneously gives us some pause, we decline to find on the facts before us that she has been pursuing this appeal in bad faith. We have agreed with her contentions that the trial court committed several serious procedural errors, and while we have determined that her efforts to set aside the parenting plan in the September 19, 2002 order fall short of the mark, we cannot conclude that her arguments lack no factu-

al or legal support. Accordingly, we deny Dr. Shofner's request that Dr. Kalisz be ordered to pay his appellate legal expenses.

## VI.

We affirm the portion of the June 10, 2003 order making the parenting plan in the September 19, 2002 order permanent and remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal in equal proportions to the parties and their sureties for which execution, if necessary, may issue.

## ORDER DENYING PETITION FOR REHEARING

Ann Margaret Kalisz has filed a timely petition requesting a rehearing with regard to our December 23, 2004 opinion affirming the final judgment of the Circuit Court for Davidson County regarding the custody of the parties' three children. Dr. Kalisz asserts that we have "shown undue deference to the findings and opinions of a trial judge who appeared to be biased." Accordingly, she insists that we should remand the case for a final permanent custody hearing and that, pending this hearing, we should reinstate the custody arrangements established by the original trial judge's November 9, 2001 order, as well as the spousal and child support arrangements in the June 18, 2001 order.

Contrary to Dr. Kalisz's assumptions, her petition for rehearing raises no new issue or matter that we have not already thoroughly and carefully considered. As we stated in our December 23, 2004 opinion, our decision to affirm the custody arrangements finalized by the June 10, 2003 order is based on (1) our own independent review and analysis of the untainted evidence in the record, free from any of the perceived biases of the original trial

judge and (2) our conclusion that even in light of the procedural errors that have been committed, sending this long-simmering custody dispute back to square one will have an adverse effect on whatever stability the parties' children have been able to attain since September 2002.

Our December 23, 2004 opinion is intended to conclude, once and for all, the direct appellate review of the propriety of the custody arrangement that has been in place for over two years. As we pointed out in our opinion, Dr. Kalisz is not foreclosed from filing and pursuing a petition to change custody which, if successful, could result in a modification of the custody arrangement which we have affirmed. She has, in fact, already filed such a petition, and her appeal from the trial court's denial of that petition has already been filed with this court. That appeal will provide Dr. Kalisz with an opportunity to demonstrate to this court how the intervening changes in the circumstances of the parties and their children warrant reopening the existing custody order that we have affirmed. Embarking on a re-examination of the merits of the September 2002 custody order will confuse, rather than clarify, the issues that are now before the courts.

It is, therefore, ordered that the petition for rehearing be and is hereby denied. The costs of this petition for rehearing are taxed to Ann Margaret Kalisz for which execution, if necessary, may issue.