IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2021

## MEGAN ARNDTS WOODY v. JEREMY BRICE WOODY

**Appeal from the General Sessions (Domestic Relations) Court for Meigs County
No. D-1741   Casey Mark Stokes, Judge**

_____

### No. E2020-01200-COA-R3-CV

_____

In this divorce case, a father appeals the trial court's reduction of his parenting time after the parties had co-parented equally by agreement, and then nearly equally under a temporary court order. He also appeals the award of alimony. We reverse the residential parenting schedule portion of the parenting plan entered by the trial court and remand for the imposition of a plan that better maximizes both parents' time with the child. Regarding alimony, because the trial court did not make the required findings, its judgment on that issue is vacated.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions (Domestic Relations) Court Reversed in Part and Vacated in Part.**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II and W. NEAL MCBRAYER, JJ., joined.

Cecilia S. Petersen and David L. Valone, Knoxville, Tennessee, for the appellant, Jeremy Brice Woody.

Matthew C. Rogers, Athens, Tennessee, for the appellee, Megan Arndts Woody.

## OPINION

### FACTS/PROCEDURAL HISTORY

Jeremy Brice Woody ("Father") and Megan Arndst Woody ("Mother") were married in October 2015 and separated in October 2017. They have one minor child, Harper, born in May 2017. Mother filed a complaint for divorce in the Domestic Relations Court of Meigs County ("the trial court") on January 28, 2019. Therein, Mother requested, *inter alia*, to be designated Harper's primary residential parent, that the trial court adopt her proposed permanent parenting plan, and that she be awarded alimony. In her proposed parenting plan, Mother sought 285 days of annual residential parenting time and requested

that Father receive 80 days per year. She also requested, *inter alia*, that Father be given visitation every other weekend, and that she be granted the power to make all major decisions regarding Harper. In his answer and counter-complaint, Father argued, *inter alia*, that the parties should be awarded equal parenting time, and requested that the trial court adopt his proposed temporary parenting plan, which proposed, in part, that Mother be designated the primary residential parent, but that they each be allocated 182.5 days of parenting time per year and have joint authority to make major decisions regarding Harper. His plan also proposed a "two-two-three" schedule: Mother would have Harper for two days, then he would have Harper for two days, and they would alternate weekends, including partial Fridays. From the time the parties separated up until June 19, 2019, they co-parented Harper equally (day-on, day-off) by their agreement, without a court order.

A hearing occurred in the trial court on June 19, 2019 to determine a temporary parenting plan, including a temporary residential parenting schedule, pending the final divorce hearing. Both parents testified.[1] The parties each stated that they communicated with each other daily regarding Harper, they had agreed on Harper's daycare (though according to Mother, she is the one who researched and picked it), and they each liked the daycare. Mother teaches eighth grade math, coaches softball at a middle school, and lives in the home the parties shared during their marriage.[2] Father is an occupational therapist and has been living with his parents since he and Mother separated.

One of the parties' main disagreements involved whether they tried to keep Harper from each other. According to Mother, Father would go out of his way to drop Harper off at daycare before work on his parenting days during the summer, when Mother did not have to work and he could have instead dropped Harper off at Mother's house on his way to work. However, Mother also testified that she estimated that Father's home was about five minutes from the daycare and fifteen minutes from her house, and his commute to work was about forty or forty-five minutes. She testified additionally that he had two possible routes he could take to work (which Father confirmed), only one of which passed by her house. Nevertheless, she repeatedly acknowledged that Harper was doing well at daycare.

Father testified that he thought the socialization Harper received at daycare was beneficial, based on his professional training and experience, some of which involved early childhood development. He further testified that there was nothing stopping Mother from picking Harper up from the daycare after he dropped Harper off. He denied ever refusing to take Harper to Mother's house, and said that when Mother asked him to bring Harper to her house instead of daycare, he told her that he thought it was in Harper's best interest to

---

[1] Father brought witnesses, including someone from Harper's daycare, but the trial court stated, "I don't know if I need to hear from them or not." Those witnesses ultimately did not testify.

[2] Because of our holding with respect to alimony, *infra*, and because child support is not at issue in this appeal, we will not detail the parties' testimony regarding their finances.

have the socialization that daycare provided, but that if Mother wanted to take Harper somewhere special, he approved of that. Father also acknowledged telling Mother that his lawyer had recommended that course of action. Additionally, according to Father, Mother sometimes used the daycare during the summer of 2018, though probably not as much as it was currently being used. He also testified that the head of the daycare told him that Harper was excelling above her age level.

Mother further testified about how Father would sometimes leave Harper with his family members while he went to football games or other outings, or sometimes took Harper with him. Father explained that he would take Harper to community events like basketball games (but not football games because they occur at later times) because he thinks community is important, and has been going to those sorts of gatherings since he was a kid. Although Mother said that she had no problem with Father going to those types of things, nor with his parents watching Harper, she expressed that she would rather have Harper while Father goes out. She also testified about a specific occurrence when Father took time off work to go to a high school basketball tournament in Murfreesboro. She said that Harper woke with a fever the morning of the tournament, and Father took Harper to his work and then to the tournament; but when Harper slept through a game and was not feeling well, "he brought her home that night because he was afraid she was going to get sick. And then he did take her to the doctor the following morning."

Moreover, Mother stated that when Father took Harper to games and outings, they would not get home until around 8:00 or 9:00 PM, and then he would take Harper to daycare the next morning between 6:30 and 6:45 AM (the daycare opened at 6:30 AM). She took issue with that type of inconsistent schedule and Harper staying up late and getting up early. Yet, when asked what kind of regimen Harper had when she was with Father, Mother essentially testified that she did not know. At a later hearing, she also admitted that she could not say Harper had never been up past 8:00 PM while in her own care, and that at least once Harper was up until 9:00 PM under her care. Additionally, when later asked about Father dropping off the child at daycare early in the morning and what time he left for work when they were married, Mother equivocated somewhat and admitted that he had always gotten up early.

As for her, Mother stated that she had to be at work at 7:30 or 8:00 AM, depending on the day, and the earliest she had dropped Harper off at daycare was 6:45 AM—but if she had to be at work at 8:00 AM, she would drop Harper off between 7:30 and 8:00 AM. She also said that when Harper was with her, Harper had a consistent schedule with a set nap time, bath time, and bed time, and consistent meals. She said that she "d[id] think that [Father] trie[d] to get [Harper] naps, but a lot of times her nap[s] seem[ed] to be in the car to and from places." According to Mother, "a lot of times" this would result in Harper being "really tired" and "sleep[ing] anywhere from two and a half to three hours" while Mother had her. At a later hearing, she reiterated her concerns about Harper's lack of

routine with Father, stating that when she would Facetime and communicate with Father, more often than not, he and Harper would still be out at 6:00 or 6:30 PM.

Mother's softball season lasts for approximately six or seven weeks, from August to September. She testified that when she would coach softball, she would bring Harper to the field and her parents would help during the games, which could end late in the evening. At a later hearing, Mother explained that if she was going to arrive home late from softball, one of her family members would watch Harper at her house, and Harper would be in bed "or very near bed when [Mother] got [home]." Mother acknowledged that she had not offered to instead have Father watch Harper during softball, and, according to Mother, Father had not asked to. Her practice of not asking Father to watch Harper during softball continued through the time of the final trial.

Furthermore, Mother asserted that she primarily took Harper to doctor's visits, and that she did not remember Father offering to take time off work to take Harper to the doctor, though she could remember him offering to take Harper if Mother made the appointment for 4:00 PM or 4:30 PM. She explained her understanding that he had a flexible work schedule that would have allowed him to leave work if Harper was sick, but he would not offer to do so. Father, on the other hand, testified that he had never refused to take Harper to the doctor, and that he had changed his work schedule to do so. And when asked if he had ever taken Harper to the doctor before 4:00 PM, he stated that he believed he had. Mother and Father agree, however, that Mother takes Harper to most of her routine wellness checks, which Father said Mother primarily schedules for after school, but that Mother had only taken Harper to the doctor for a sick visit one more time than Father.

Mother also testified that Father has a pornography addiction, to which she attributed their separation. She stated that when she and Father first separated, she thought they were going to be able to make the marriage work, until Father told her that he thought they needed a divorce. Mother was at times inconsistent in her testimony about whether Father sought help for his purported "addiction." Mother first claimed that Father refused help, which led to the separation. Mother later admitted that Father had sought counseling for the issue.

Mother also admitted that she had no proof or reason to believe that Harper had been exposed to pornography, later also agreeing that she has no proof that pornography has had any negative effect on Harper's care. Father confirmed this, testifying that Harper had never been exposed to pornography. He further testified at a later hearing that he has never accessed pornography when he has had Harper. Regarding the pornography issue, the trial court asked Mother if she had concerns, to which she answered:

> I think I do just in general. I have read and studied a lot. Like I said, I went to counseling myself on that, and I realized that it's an addiction. And a lot of things I've read and people I've talked to with similar experiences, it's a

very real fear that she will be exposed to it. And I'm not saying on purpose, let me make that clear. I don't think he would necessarily ever purposely try to put her in that situation but it is happening with other [*sic*] and she is at the age [two years and one month] where she can almost work my phone better than I can. So yes, I think there's a real fear that there will be some exposure there of some sort.

According to Mother, she had surgery in or around December 2017, and she and Father agreed for Father to have Harper during some of her recovery. Mother agreed that before the court became involved, she and Father worked together on Harper's schedule, accommodating each other if they needed to deviate from the day-on, day-off schedule. She also stated that she had been trying to accommodate Father's schedule, even if he arrived earlier to pick Harper up than he initially estimated, because she "want[ed] to do what is best for [Harper], and fussing between [her and Father] is not what is best for [Harper]." Yet, Mother testified that their equal co-parenting arrangement was not in Harper's best interest.

In addition, Mother testified that she thought Harper "need[ed] to" have contact with Father while in Mother's care, and thus agreed that she "d[id not] have any problem with contacting [Father], updat[ing] [Father], let[ting] him facetime or anything that he want[ed] to do as far as that sort of thing." Moreover, she testified that she would expect the same of Father when Harper was in his care. She also agreed that she would not have a problem with Father spending extra time with Harper as long as it was discussed beforehand. When asked if she would promote a good relationship between Harper and Father, she answered, "Absolutely. Absolutely."

Father testified that he kept a diary from October until mid-April 2017, documenting the days he had Harper and times he picked her up and dropped her off. He started another diary after Mother filed for divorce, which he was still keeping at the time of the hearing and included a log of times he and Mother communicated about when they put Harper down for naps and bed. These diaries were introduced in evidence.

According to Father's testimony, when Harper was born, Mother took the rest of the school year (approximately one week) off, and Father took a week off from work. He further testified that Mother primarily cared for Harper after she was born while Father worked, up until softball season, which started at the end of July. At that point, he said that Mother's sister took care of Harper during the day, and he would take Harper to the softball games after he got home. Father stated that he would then take Harper home from the games and give her a bottle, bath, and get her ready for bed, or sometimes wait for Mother to give her a bath. According to Father, this lasted from when Harper was three months old to five months old, and at the end of that softball season, Mother asked Father to stop coming to the games.

Father also testified that while he and Mother were still cohabitating but apparently after they separated, Mother would at times go out late at night, sometimes not returning until the next morning. Mother later explained that she would go for drives after putting Harper to bed because she was having anxiety attacks related to her marital issues and felt pressured by Father's "guilt trips" related to sex (detailed further, *infra*). Sometimes she would spend the night at other places, and sometimes she would return after she thought Father was asleep. She asserted that "[she] would always make sure that [she] took care of Harper first" but acknowledged that she felt comfortable leaving Harper in Father's care while she was gone. She agreed that "even after all of that is when [her] family invited [Father] on [] family trips," and said that she had been struggling with whether fixing the marriage, which "ideally [] is what [she] would have wanted," was best for Harper.

Father further testified extensively about the schedule he maintains with Harper, including meal and bed times.[3] Regarding Father's employment, he explained that he typically worked between thirty-eight and forty-two hours weekly, on an hourly schedule. He indicated that his work schedule was relatively flexible and the earliest he had to be at work was 9:00 AM. He said that his round-trip commute increased by fifteen minutes each way after he and Mother separated, such that it had become one hour and twenty minutes.

Otherwise, Father testified that besides his and Mother's disagreement regarding how much parenting time he should receive, they had been able to work everything out relating to Harper. One apparent example is that he said that he had not objected when Mother had wanted to keep Harper for more days than planned for a beach trip. In addition, he stated that he did not have any reason for limiting either his or Mother's time with Harper, and that fifty-fifty time was what they had agreed on and was working for Harper.

At the end of the June 19, 2019 hearing, the trial court made the following oral ruling, in pertinent part:

> I think I can make a ruling on this case without going into a bunch of witnesses. Sounds like you've been working together somewhat pretty well. That's good news considering you have a child. There will be eighteen years of that. This is just a temporary ruling though. I know it's on the docket for August and it sounds like it's working out pretty soon.
>
> Since [Mother] is off this summer I'm going to give her standard, we're going to do standard visitation. [Father] will have – what we can do is we'll do every weekend for [Father], and [Mother] will have the child through the week. . . . And of course this thing will probably be resolved here two or three months, so I think that's what we need to do right now.

---

[3] According to Father's diary of January 2019 until June 2019, he would sometimes lay Harper down later than his testimony indicated.

A written order on the temporary hearing was filed on September 2, 2019, which included the following findings, in relevant part:

1. The parties have been attempting to work together to maximize each other's time due to the fact that they have been regularly exchanging the child since the parties' separation.

2. It is appropriate for [] Father to exercise weekend visitation each week, from Friday at 6:00 pm to Monday morning, due to the fact that [] Mother is an educator and that her work schedule allows for her to co-parent through the week during the summer.

3. [T]his matter is set for Final Hearing on September 4, 2019.

4. [] Mother shall be named the Temporary Primary Residential parent.

*        *        *

8. The Court hereby reserves [] Mother's request for retrospective and prospective alimony[.]

9. Either party can elect one full week to take the child for vacation between now and the end of summer if they so desire. The opposing party and/or their attorney's office shall be informed of a detailed itinerary for trips *pendente lite*.

10. [] Father shall pick up and receive the child at 6:00 pm on Friday and return the child to [] Mother's home on Monday morning prior to going to work, until further order of the Court.

11. The parties shall work together to accommodate equal make up parenting time pursuant to the requested and heretofore ordered vacation time[.]

Both the parties and the trial court agree that this temporary plan amounted to nearly equal parenting time for Mother and Father.

On September 27, 2019, Mother filed a revised proposed permanent parenting plan in the trial court which, in pertinent part, suggested that she have 221 days per year, Father have 144 days, and she have authority to make major educational decisions for the child. The plan also proposed that the remaining major decisions regarding Harper be made jointly, but that Mother, "as the primary residential parent, shall have final say on all major decisions regarding the child."

A final hearing occurred in the trial court on January 22, 2020. Mother and Father testified again, along with Tanya Orean, the owner and director of Harper's daycare; Charles Griffin, the pastor at Father's church; Michelle Houston, Father's work supervisor of six years; and Diana Woody, Father's mother. Much of the parties' testimony essentially reiterated their testimony from the June 2019 hearing and has already been discussed. Thus, we will only discuss testimony from this hearing to the extent that it presents new information.

Ms. Orean generally testified that Harper is well-adjusted, the parents are both doing a good job, and the parties do not complain about each other's parenting. Ms. Houston discussed the flexibility in Father's work schedule and how he would be able to accommodate his proposed parenting schedule. Ms. Houston also testified that Harper is attached to Father and well-adjusted. Father's mother testified that both parents are good parents but claimed that Mother was "not as present" with Harper "toward the end."

Mr. Griffin testified that Father attends his church regularly with Harper and has observed nothing of concern with regard to Father's parenting. When questioned about Father's pornography habit, Mr. Griffin testified that he would probably recommend pastor counseling for such an issue. Mr. Griffin refused to comment on whether he had participated in counseling with Father, however, due to the clergy privilege;[4] but he testified that he had never seen anything that would raise a suspicion of child sexual abuse with regard to Father or Harper.

Mother testified that Father's pornography issue was the proverbial last straw in the marriage. According to Mother, she did not know about the issue until after the marriage, and only sought to learn the extent of Father's viewing habits after the separation. According to Mother, Father was then watching pornography "at least a couple times a week," which according to Father, was an improvement. However, Mother opined that Father's continued viewing of pornography a couple times per week proved that the issue was unresolved. Yet, she admitted that she declined Father's request to go to couples' counseling, preferring that the parties seek counseling individually first. According to Mother, Father did not view the pornography as a major issue. She again said that he did not seek counseling or help, but later conceded that he had eventually attended counseling. Father testified that the counseling was in part related to pornography and in part to cope with the difficulties of having to move back in with his parents and raise a child with them.[5]

Father neither admitted nor denied that he had a pornography "addiction." He admitted, however, that it was an issue he needed to work on. According to Mother, after

---

[4] *See* Tenn. Code Ann. § 24-1-206 (explaining that clergy members shall not be required to disclose confidential information during testimony).

[5] Father's testimony was not necessarily a model of clarity, either. For example, he stated that he and Mother did go to counseling, but also that Mother declined his many requests to go to counseling.

Father "confessed" his issue, "it was a lot of trying to get [her] to have sex with him." She said that he would leave Bible verses for her "that were saying what a Christian wife should do. . . . [T]hey were very much directed toward how and why [she] needed to forgive him and what [she] needed to do to fulfill [her] wifely duties." She felt that the Bible verses "were ways to try to manipulate [her.]" Yet, later, Mother repeatedly offered that she "d[id] not] know [Father's] intent behind [leaving the Bible verses]."

Her lawyer asked, "[w]ere there times when he was physically aggressive towards you, sexually or violent?" She answered, "He had never been necessarily violent toward me. There was one major incident, it was right after I had Harper [in May]. It was July 6th." According to Mother, after her doctor cleared her for sexual activity, Father would repeatedly "guilt trip" her, so "after a little over a week" Mother "agree[d] to have sex with him[.]" Mother testified, *inter alia*,[6] that at some point she told Father to stop and he paused briefly before continuing. When she asked him the next day why he had not stopped, she said that "he told [her] that he didn't know [she] meant to really stop." She said that she did not remember Father apologizing, but she was "also not saying that he didn't." Mother testified that this event was traumatic, and said, "I don't know what to call it because I don't want to call it rape because I did agree to it, but when I told him to stop, given the fact that I was still healing and he didn't." Mother agreed that Father continued making repeated sexual advances toward her after that incident even though she told him to stop. She stated that she eventually went to therapy because of this incident, and acknowledged having tried medication for her anxiety. She agreed that she has not had anxiety since Father moved out, at which time she stopped taking the medication.

As for Father's testimony regarding this incident, he said that he had "misunderstood. And then was apologetic and concerned . . . the next day." Additionally, he agreed that there had been no physical violence between him and Mother. He expressed that he had been unaware of the marital issues until around Fall of 2017, including that he did not know what was causing Mother anxiety, though he said that he had asked her if there was anything he could do.

When asked why she agreed to have an equal co-parenting arrangement with Father before a court became involved, Mother said that the main reason was that she did not think it was going to last long, and that the separation was supposed to be brief. She also said, "I was not willing to go long without seeing [Harper]." She agreed that the trial court's order after the temporary hearing "made sense to [her] at the time" because "she was off [work] during the summer." As to the plan still being in effect at the time of the current hearing, Mother stated that it was working well for her to have Harper during the week because "it's good for [Harper] to have a routine," but she complained that she therefore had "no weekend time with [Harper] at all." She essentially claimed that Father was generally

---

[6] The testimony regarding the details of this event was fairly graphic. We have thoroughly reviewed the entirety of the proof on this issue, but we decline to reproduce it here.

- 9 -

unwilling to work with her on swapping their time after the temporary order was in effect, even if he wanted to take some of her time (except in at least one instance, where they eventually came to an agreement). However, she acknowledged that Father had given her the weekend before fall break, and that Father therefore did not see Harper for ten days, except for about an hour. As for Thanksgiving and Christmas of 2019, Mother alleged, *inter alia*, that she had given Father an hour and a half on both Thanksgiving Day and Christmas Day, and Father did not give her time in return. According to Father, Harper did not get to see or spend time with his entire family on Thanksgiving, in part because forty minutes of the one and a half hours was taken up by travel time.[7]

Additionally, Mother testified that she picked Harper up (presumably from daycare) on Fridays and spent the intervening hours with Harper before Father came to get Harper— instead of Father picking Harper up from daycare, as he had apparently done before the temporary order went into effect. She said that she did this because she wanted to have as much time with Harper as possible before Father picked Harper up, and the temporary order said that he was to pick Harper up on Fridays at 6:00 PM. She nevertheless agreed that each parent should be able to have Harper on days when they are off work and the other parent is at work, even if it is technically the other parent's day. Confusingly, when Mother's lawyer asked her why she thought equal co-parenting time is or is not in Harper's best interest, she said,

> Oh, I definitely think this is in her best interest. I think she needs a steady routine. I think she needs – she needs time, weekend time with both parents. I'm not trying to keep her from him at all, or him from her at all. But I think that she needs the steady routine that she has when she's with me. . . . [T]hat's critical when she's young. And not to mention that she is a girl. I think that's about it.

It appears, however, that she was referencing her proposed parenting plan (which proposed that Father have 144 days with Harper each year, not equal time).

When Mother's lawyer asked Mother how Harper is doing and if she is "developing and doing good," Mother stated that Harper is "[g]reat. She's doing great." She testified that her parents, sister, and both of her grandmothers help her take care of Harper. She said that Harper "does not normally respond very well on Friday afternoons to have to go with [Father]," so she tries to encourage Harper to be excited to see Father, and Father usually brings Harper a toy and/or drink to make the transition easier. She said, "I don't want [Harper] to view [Father] in any sort of negative way. . . . [S]he doesn't need to know the problems between [Mother and Father]."

---

[7] Mother stated that she drove Harper part of the way, and therefore not all of the travel time cut into Father's time. Father disputed this, instead saying that Mother transported Harper on Christmas, not Thanksgiving.

She acknowledged agreeing to the equal co-parenting schedule when she already knew about all of the grounds she claimed for divorce. She agreed that she had stayed with Father, become pregnant, and had Harper after Father informed her regarding his pornography viewing. She also agreed that at no point did she stop Father from seeing Harper, because "[she is] not trying to keep him from seeing Harper." Father and Mother both essentially agreed that, overall, they have been able to get along and communicate, have had no major disagreements regarding Harper, and have been basically sharing parenting responsibilities equally, at least since the separation.

Mother also admitted that Father had properly cared for Harper during his parenting time, and Father agreed that he and Mother have equal ability to perform parenting responsibilities. Mother further conceded, *inter alia*, that they both have love and affection for Harper; neither has denigrated the other as a parent; the continuity of Harper's life was being "maintained"; and there is no proof of any emotional or physical abuse of Harper by either party. She acknowledged that despite Father agreeing with her regarding where Harper would eventually attend elementary school, she still wanted sole control over decisions about Harper's education. She again expressed her belief that daycare is good for Harper, reasoning that it provides Harper social interaction, develops her education, and "there's a Bible aspect to it" that Mother thinks "is great for [Harper] to be involved in." Mother also "like[s] the interaction with the teachers, . . . [and the] immune system development."

Father additionally testified, *inter alia*, that he thought his proposed two-two-three schedule with alternating weekends would be better than the day-on, day-off schedule, because it would give Harper more continuity and full weekends with each parent. He expressed a willingness to be flexible in not adhering rigidly to his proposed parenting plan, and agreed that he would continue being able to make his employment schedule work with his proposed parenting plan. He also said that he wants Harper to go on all of the vacations Mother takes with Mother's family. When asked about Mother's willingness and ability to promote the parent/child relationship, Father expressed concerns that she seemed to want to drastically limit his custody only after the divorce proceedings commenced— whereas they had been doing well sharing equal custody before the temporary court order was entered.

The trial court issued an oral ruling at the conclusion of the January 2020 hearing. In relevant part, the trial court found as follows:

> I'm going to grant [Mother] a divorce on inappropriate marital conduct due to the pornography situation. I think since – with that in mind I think the husband needs to pay her legal fees. And I think there needs to be a little bit of alimony for a short period of time. I think the alimony should be five hundred dollars a month for two years. That will kind of help with the situation of divorce.

Let's go to the child part. I'm going to grant a traditional custody visitation situation. Every other weekend for [Father], every Thursday evening for [Father] because of the age of the child and her being a little girl, I think that would be good, especially for the next few years. . . .

As far as holidays I think we should adopt the traditional holiday schedule where you alternate or share. . . . Two weeks in the summer for [Father] I think is what [is traditional]. . . . Court costs, that's going to run with attorney fees, [Father] can pay that also.

Father's counsel then asked for a stay under Rule 62 of the Tennessee Rules of Civil Procedure of the attorney fees and alimony until this Court makes a ruling, which the trial court denied. Mother's counsel then stated, "I'll draw the order."

The trial court filed a written order on September 2, 2020, granting Mother a divorce on grounds of inappropriate marital conduct and dividing the parties' assets. The trial court's alimony ruling was as follows: "The Court hereby indicated that a little alimony for a short period of time should be awarded and hereby orders that [Father] pay transitional alimony in the amount of $500.00 per month for a period of two (2) years." With respect to custody of Harper, the trial court's order stated: "The Court indicated that it was going to grant traditional custody of this case and situation every other weekend for [] Father every Thursday evening because of the age and gender of the child and the attached Parenting Plan is adopted by the Court." It named Mother the primary residential parent, giving her 245 days of parenting time and Father 120 days per year. It also appears to have granted the parties joint decision-making authority.[8]

Father filed a notice of appeal in this Court on September 3, 2020. On September 16, 2020, Mother filed a motion to alter or amend the trial court's final judgment to add findings of fact and conclusions of law regarding the co-parenting factors in Tennessee Code Annotated section 36-6-106. The trial court denied Mother's motion to alter or amend on the basis that it did not have subject matter jurisdiction. This Court filed an order on December 1, 2020, explaining that the trial court's September 2, 2020 order did not meet the finality requirements of Rule 58 of the Tennessee Rules of Civil Procedure, and that the trial court had incorrectly determined that it lacked subject matter jurisdiction to adjudicate the motion to alter or amend. Both parties submitted proposed findings of fact and conclusions of law to the trial court.[9]

---

[8] Parts of the copy of the parenting plan in the record are difficult to read.

[9] Mother's motion to alter or amend was first heard on October 7, 2020. There appears to have been another hearing in the trial court on April 7, 2021. There are no transcripts of these hearings in the record.

The trial court filed a final order incorporating findings on May 13, 2021. Therein, the trial court made findings of fact and conclusions of law with respect to custody of Harper, in addition to the previous findings from the September 2, 2020 order. These findings will be discussed in detail as relevant, *infra*. The court found that four factors under section 36-6-106(a) equally favored Mother and Father; three factors were inapplicable; and seven factors favored Mother, to varying degrees. The trial court then concluded that "the Permanent Parenting Plan filed with the Final Judgment on September 2, 2020 is in the best interest of the child." The trial court's May 13, 2021 order still did not comply with Rule 58, however. Therefore, finally, on June 2, 2021, the trial court entered a Rule 58-compliant final order, incorporating its findings from the May 13, 2021 order and granting Mother's motion to alter or amend. Father appealed.

## ISSUES PRESENTED

Father raises the following issues, which we have slightly reworded:

1. Did the trial court err in not entering Father's Proposed Permanent Parenting Plan?

2. Did the trial court, by adopting Mother's Proposed Findings of Fact and Conclusions of Law, fail to exercise its own independent judgment?

3. Did the trial court, in adopting Mother's Proposed Permanent Parenting Plan, fail to maximize each parent's co-parenting time as required by Tennessee Code Annotated section 36-6-106(a)?

4. Should this Court reverse the trial court and adopt Father's Parenting Plan in the best interests of Harper?

5. Did the court err in basing its award of alimony on the fact it would "help" Mother, rather than analyzing the statutory factors in Tennessee Code Annotated section 36-5-121?

## STANDARDS OF REVIEW

As this Court has previously explained,

[t]rial courts have broad discretion to fashion parenting plans that best serve the interests of the children They must, however, base their decisions on the evidence presented to them and upon the proper application of the relevant principles of law. While we are reluctant to second-guess a trial court's decisions regarding a parenting plan, we will not hesitate to do so if we conclude that the trial court's decision is not supported by the evidence, that the trial court's decision rests on an error of law, or that the child's interests

- 13 -

will be best served by another parenting arrangement.

*Shofner v. Shofner*, 181 S.W.3d 703, 716 (Tenn. Ct. App. 2004) (internal citations omitted).

Similarly, "[t]rial courts are afforded broad discretion in decisions regarding the nature, duration, and amount of alimony; therefore, but for an abuse of discretion, the trial court's award of alimony will normally be upheld on appeal." *Barnes v. Barnes*, No. M2011-01824-COA-R3-CV, 2012 WL 5266382, at *4 (Tenn. Ct. App. Oct. 24, 2012).

"It is our job in reviewing for an abuse of discretion to see that the trial court's order is made with due regard for controlling law and based on the facts proven in the case." *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013) (citation omitted). "Thus, if the evidence preponderates against the trial court's findings of fact upon which it bases it determination, or simply focuses on facts which should not really matter while ignoring those that really do matter, the court may be found to have abused its discretion." *Id.*

## DISCUSSION

### A. PARENTING PLAN

#### i.

At the outset, we note that Father does not appear to appeal the designation of Mother as Harper's primary residential parent.[10] Therefore, we will focus our analysis on the residential parenting schedule. We begin by addressing Father's argument that the trial court failed to exercise its independent judgment by improperly parroting, in large part, Mother's proposed findings and conclusions, which are largely unsupported by the record. As reflected in the trial court's oral and written orders from the January 22, 2020 hearing, Father is correct that the trial court initially appears to have only considered the "tender years" doctrine and Harper's gender in making its custody determination; in its oral ruling, the trial court stated that it was "grant[ing] a traditional custody visitation situation . . . because of the age of the child and her being a little girl," which the trial court "th[ought]

---

[10] According to Father's counsel, the reason he designated Mother as primary residential parent in his proposed parenting plan is that the applicable statute, at the time he submitted his plan, dictated that only one parent could be the primary residential parent, whereas it changed in July 2019 so that both parents can be. *See* Tenn. Code Ann. § 36-6-410(b) ("Notwithstanding any law to the contrary, when the child is scheduled to reside an equal amount of time with both parents, the parents may agree to a designation as joint primary residential parents or to waive the designation of a primary residential parent. In the absence of an agreement between the parties, a single primary residential parent must be designated; provided, that this designation shall not affect either parent's rights and responsibilities under the parenting plan.") (effective July 1, 2019). Nevertheless, he does not challenge Mother's designation as primary residential parent on appeal, so we will not disturb it.

[] would be good, especially for the next few years." This oral ruling was reflected in the trial court's written order, which again stated that the court made its custody determination "because of the age and gender of the child." It was not until this Court advised the trial court of its subject matter jurisdiction to rule on Mother's motion to alter or amend, and after the parties submitted their proposed findings and conclusions, that the trial court added more reasoning for its decision regarding visitation.

Mother is correct that Tennessee does not recognize a "tender years" doctrine. *See Gooding v. Gooding*, 477 S.W.3d 774, 778 (Tenn. Ct. App. 2015) (citations omitted) ("The tender years doctrine is a presumption that young children should remain in their mother's custody. Tennessee law no longer recognizes this presumption, and use of it is error."). Nor is gender a determinative factor in custody determinations. *See* Tenn. Code Ann. § 36-6-101(d) ("It is the legislative intent that the gender of the party seeking custody shall not give rise to a presumption of parental fitness or cause a presumption or constitute a factor in favor or against the award of custody to such party."). Therefore, the trial court's reliance on Harper's young age and gender in deciding the details of the parenting plan was error. However, the trial court did ultimately add findings of fact and conclusions of law in its May 13, 2021 order. The first question is whether those findings and conclusions are a product of the trial court's independent judgment.

"[A] court's decisions must be, and must appear to be, the result of the exercise of the trial court's own judgment[.]" *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 312–13 (Tenn. 2014) (citations omitted). Our highest court has expressed concern "about the practice of courts adopting verbatim findings of fact, conclusions of law, opinions, and orders prepared by counsel for the prevailing party. " *Id.* at 314 (citation omitted). Further, "[a] trial court's verbatim adoption of verbiage submitted by the prevailing party detracts from the appearance of a hardworking, independent judge and does little to enhance the reputation of the judiciary." *Id.* at 315 (footnote omitted). Consequently, in a trial court's order, "the findings and conclusions must accurately reflect the decision of the trial court. Second, the record must not create doubt that the decision represents the trial court's own deliberations and decision." *Id.* at 316 (citations omitted). "Accordingly, reviewing courts have declined to accept findings, conclusions, or orders when the record provides no insight into the trial court's decision-making process, or when the record 'casts doubt' on whether the trial court 'conducted its own independent review, or that the opinion is the product of its own judgment.'" *Id.* (citations omitted).

Here, the trial court did not provide the parties with guidance for preparing their proposed findings and conclusions, and the only reasoning it had given for its decisions was, as explained above, Harper's age and gender. Yet, the trial court largely adopted Mother's proposed findings and conclusions, including a significant number of them verbatim. Moreover, as will be discussed *infra*, we agree with Father that the record does not entirely support all of Mother's, and, indeed, the trial court's, findings and conclusions,

and they are unjustifiably skewed in Mother's favor. Therefore, the question of whether the trial court sufficiently exercised its independent judgment here is close.

However, this Court has previously determined that if a trial court alters a party-prepared order, that order can pass muster under *Lakeside*. *See Vaughn v. DMC-Memphis, LLC*, No. W2019-00886-COA-R3-CV, 2021 WL 274761, at *6 (Tenn. Ct. App. Jan. 27, 2021) ("[T]he written order ultimately entered by the trial court contains two paragraphs that were not included in the proposed order. . . . [T]hese alterations confirm that the order entered was not a verbatim copy of what was submitted by [one of the parties], but was the trial court's own independent judgment."). Here, the trial court added a limited number of findings to its final order that were not taken from Mother's proposed order, and made other limited edits, including omitting some of Mother's proposed findings and rearranging others. Therefore, although "[t]he manner in which the trial court entered its final judgment in this case comes perilously close to violating [*Lakeside*]," *F & M Mktg. Servs., Inc. v. Christenberry Trucking & Farm, Inc.*, No. E2015-00266-COA-R3-CV, 2015 WL 6122872, at *7 (Tenn. Ct. App. Oct. 19, 2015), we will proceed to consider the merits of this appeal. *See id.* Additionally, we are mindful that this case has been ongoing for several years at this point, and proceeding to the merits will afford the parties and Harper resolution. *See Huggins v. McKee*, 500 S.W.3d 360, 366–67 (Tenn. Ct. App. 2016) (exercising the Court's discretion to decide the appeal's merits even though the trial court's practice was "not fully compliant with the letter and spirit of [*Lakeside*], . . .[i]n the interest of providing the parties to this case a final resolution of the issues.").

## ii.

We will now proceed to consider Father's arguments regarding the propriety of the residential parenting schedule adopted by the trial court. "[T]he fault a parent bears for the breakup of the marriage is not relevant for the purposes of a custody determination, except insofar as that parent's conduct bears on his or her fitness for parental responsibilities." *Cummings v. Cummings*, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *8 n.5 (Tenn. Ct. App. Oct. 15, 2004) (citing *Mimms v. Mimms*, 780 S.W.2d 739, 745 (Tenn. Ct. App. 1989)). Therefore, in creating parenting plans, "[t]he needs of the children are paramount; the desires of the parents are secondary." *Shofner*, 181 S.W.3d at 715–16 (citation omitted). "Parenting plans should never be used to punish or reward the parents for their human frailties or past mis-steps, but rather they should be used to advance the children's best interests by placing them in an environment that best serves their physical and emotional needs." *Id.* at 716 (citations omitted).

"Tennessee courts must [] fashion custody arrangements so as to give each parent the maximum amount of time possible with the child, in accordance with the child's best interests." *Rountree v. Rountree*, 369 S.W.3d 122, 129 (Tenn. Ct. App. 2012); *see also* Tenn. Code Ann. § 36-6-401 ("The general assembly recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and the relationship

between the child and each parent should be fostered unless inconsistent with the child's best interests."). A "trial court must consider the factors listed in Tennessee Code Annotated section 36-6-106(a)(1)–(15) to ascertain the best interest of the child, in determining a residential schedule and naming a primary residential parent." ***Sullivan v. Sullivan***, No. M2018-01776-COA-R3-CV, 2019 WL 4899760, at *4 (Tenn. Ct. App. Oct. 4, 2019) (footnote omitted).[11] Section 36-6-106(a) "reflects a public policy in favor of allowing the child ample time with both parents, which is a paramount consideration in all Tennessee parenting plan decisions." ***Rountree***, 369 S.W.3d at 136 n.3. Specifically, section 36-6-106(a) directs courts to "order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with . . . the location of the residences of the parents, the child's need for stability," and the following factors, where applicable:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

---

[11] *See also* Tenn. Code Ann. § 36-6-404(b) (stating that courts should consider the factors in section 36-6-106(a) when designing a residential parenting schedule unless certain factors in section 36-6-406 are dispositive). Neither party has raised a specific issue as to the factors in section 36-6-406, so we will not tax the length of this Opinion with further consideration of those factors.

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . . ;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. . . . ;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a).

"The best interest determination is a fact-sensitive inquiry" that "does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Drucker v. Daley*, No. M2019-01264-COA-R3-JV, 2020 WL 6946621, at *12 (Tenn. Ct. App. Nov. 25, 2020) (internal quotation marks and citation omitted). Instead, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* (internal quotation marks and citation omitted).

- 18 -

Father argues that his proposed parenting plan (of co-equal parenting time) is in Harper's best interest and should therefore be adopted. Father also argues that the trial court erred by failing to maximize each party's parenting time. We will address these in turn.

Starting with best interest, the trial court here ultimately "made findings concerning several of the statutory factors." *In re Lennon R.*, No. M2018-00541-COA-R3-JV, 2019 WL 2226007, at \*5 (Tenn. Ct. App. May 23, 2019). We will devote our analysis to the best interest factors that the trial court found favored Mother, "review[ing] each of th[ose] factors . . . against the record to determine whether the trial court erred in fashioning the Parenting Plan." *Id.*

> First, the trial court found that factor one favors Mother, stating as follows:
> This factor weighs heavily in favor of [] Mother. The proof at trial was that [] Mother had performed the majority of parenting responsibilities relating to the daily needs of the child both during the marriage, pre-separation, post-separation, and under the Temporary Orders of this Court. At the temporary hearing, significant co-parenting time between the minor child and [] Father was awarded. The Court awarded significant co-parenting time in an attempt to decipher, among other things, how [] Father would perform with significant co-parenting time during the summer break.
>
> The Court finds that [] Father does have a loving relationship with the child however, [] Father was granted significant *Pendente Lite* co-parenting time over several months and the Mother remained primarily responsible for the daily needs and caretaking of the child.
>
> Although [] Father technically exercised his co-parenting time, [] Father would take the child to daycare, even on his days off. The Court was disappointed in [] Father's failing to take advantage of spending time with the child on his off days. Further, the Father was unable to articulate activities and responsibilities that were completed when he had the opportunity to co-parent equally.
>
> Therefore, this factor weighs heavily in favor of the Mother.

*See* Tenn. Code Ann. § 36-6-106(a)(1) (involving the strength of the parents' relationship with the children and which parent has performed most of the parenting duties).

The evidence does not completely support these findings. The trial court's finding that Father took Harper to daycare even on his days off of work is somewhat misleading. From our review of the record, there is no evidence that Father did this during his designated parenting time. Instead, it appears that this finding is based on Mother's testimony that Father took a week off of work for Christmas, during which Mother had to

- 19 -

work, and asked Mother if he could keep Harper on Monday and Tuesday of that week. Mother testified that she told Father she was okay with that if she could receive some of his designated parenting time in return, since she would be giving him two of her days. She said that Father would not agree to that, so he took Harper to daycare the Monday of his week off and then he did not see Harper for the rest of that week. Certainly, this testimony suggests that Father was unwilling to work with Mother to some degree. However, it also reveals that Mother was engaging in the same type of rigid, uncooperative behavior that she has accused Father of: she kept Father from seeing Harper on her parenting days even though she had to work and he did not. This is precisely what Mother accused Father of doing when they were co-parenting day-on, day-off by agreement, and he would allegedly go out of his way to drop Harper off at daycare instead of Mother's house. Mother's behavior in this respect is all the more confounding considering that she agreed during her testimony that one parent should be able to have Harper if it is the other parent's day but that parent has to work.

Additionally, the record does not support the trial court's finding that "Father was unable to articulate activities and responsibilities that were completed when he had the opportunity to co-parent equally." In fact, Father explained in detail Harper's routine when she was in his care, and gave plenty of examples of activities they do together, including going to sporting events, church, and the zoo. Indeed, it was Mother's testimony that Father almost takes the child to do too many activities and therefore does not keep a consistent schedule.

Perhaps most importantly, however, the parties essentially agree that they have exercised equal parenting responsibility, at least since the separation. Additionally, even during the marriage, Father's testimony, which Mother does not appear to dispute, was that while Mother primarily cared for Harper for about two months after her birth, Mother's softball season resumed thereafter, during which time Father became more involved. Then, Mother had surgery in December 2017, and Father took over the primary parenting responsibilities for at least part of the time she was recovering. Mother did testify that she took Harper to more doctor's visits and was more willing to do so than Father, including taking off work when Harper is sick. The proof showed that Mother took Harper to more well visits than Father, but only to one additional sick visit. Additionally, Mother testified that she researched and picked the daycare, though Father agreed to it. Thus, the record does not support concluding that this factor weighs heavily in Mother's favor. Rather, given Mother's slightly greater involvement in caring for Harper immediately after she was born, Harper's medical care, and researching the daycare, this factor slightly favors Mother. *See Brown v. Brown*, 571 S.W.3d 711, 723 (Tenn. Ct. App. 2018) (concluding that even though the father worked immediately after the child was born, eventually getting two weeks of paternity leave, "[M]other's care for the child during these early months d[id] not, by itself, make mother the primary caregiver"); *cf. Cummings v. Cummings*, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *9 (Tenn. Ct. App., filed Oct. 15, 2004) (emphasis added) (explaining that mother was clearly the primary caregiver, stating, "[she] was

*overwhelmingly* responsible for the daily needs of the child up until" the parties co-parented on an alternating-week basis during the pendency of the divorce).

Regarding factor two, the trial court stated as follows:

The Court finds that the parties do attempt to communicate regarding the child and promote a relationship with the other party.

Mother testified that [] Father would not allow her co-parenting time during Father's co-parenting time even if she was off from work and the child was in daycare.

[] Mother further testified that the child did not stay with Father while she coached softball, however, she also testified that the Father never requested the child stay with him.

[] Father used the temporary orders of the Court and technicalities of the order as a weapon instead of working with Mother. Father's unwillingness to work with Mother on her days off show a propensity for [] Father not to work with the Mother in future.

The child has bonded with both parents. The Court believes that this bond can be attributed to the Mother's consistent desire and actions that have led to the child's bonding with both parents despite [] Father's shortcomings. The Court heard proof at trial that the Mother had been physically, sexually, and mentally abused by [] Father, including, an allegation of marital rape. The Court credits and finds that the Mother has gone above and beyond with the child by facilitating and promoting a good and healthy relationship with [] Father and not attempting to turn the child against [] Father emotionally.

Therefore, this factor weighs heavily in favor of the Mother.

*See* Tenn. Code Ann. § 36-6-106(a)(2) (involving the parents' past and potential for future performance of parenting duties and their willingness to encourage the children's relationships with each parent).

Our analysis of factor one largely applies here. A fair reading of the evidence does not lead to the conclusion that Father weaponized the court orders or was uniquely unwilling to cooperate with Mother. Mother complains about not getting time in return for an hour and a half on Christmas and Thanksgiving Days. Yet, she also testified at the final hearing that she received the weekend before fall break with Harper, and she does not dispute that this resulted in Father only seeing Harper for roughly one hour in a ten-day period. Moreover, according to Mother's own testimony, she insisted on adhering strictly

to the trial court's temporary plan—whereby Father had to pick Harper up from her at 6:00 PM on Fridays, rather than from daycare as he had been doing, which apparently limited his time with Harper. This, combined with our above analysis under factor one, leads us to conclude that the trial court erred in determining that Father weaponized the trial court's orders and was uniquely unwilling to work with Mother on her days off. Rather, the record demonstrates that to the extent the parties have been unwilling to cooperate or been inflexible, they are equally culpable.

We next consider the trial court's finding with regard to the "abuse" suffered by Mother and the trial court's finding that Father's bond with Harper is therefore attributed to Mother's herculean efforts to facilitate and promote it. We must make several observations as to this finding.

First, the trial court's findings here are somewhat unclear. The trial court specifically finds that it "heard proof" of physical, sexual, and mental abuse by Father against Mother. The language employed by the trial court could certainly be clearer, as the order merely states what proof was presented, not that the trial court found that such abuse actually occurred. *See Rosebrough v. Caldwell*, No. W2018-01168-COA-R3-CV, 2019 WL 6898218, at *4 (Tenn. Ct. App. Dec. 18, 2019) (holding that an extensive trial court order was nevertheless deficient where it largely consisted of "conclusory statements regarding the evidence presented and not specific findings of fact as required"); *see also In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499, at *12 (Tenn. Ct. App. Nov. 16, 2015) ("[T]he court must go beyond mere summation [of the evidence] by linking the evidence to its clearly stated findings of fact and conclusions of law."). Moreover, the court explicitly found that factor eleven in the best interest analysis, dealing with evidence of abuse to the other parent, is not applicable in this case, suggesting that the trial court found that no abuse occurred against Mother. *See* Tenn. Code Ann. Tenn. § 36-6-106(a)(11) (emphasis added) ("Evidence of physical or emotional abuse to the child, *to the other parent or to any other person*. . . ."). But, we also read orders for what is both explicitly stated and clearly implied. *See Morgan Keegan & Co. v. Smythe*, 401 S.W.3d 595, 608 (Tenn. 2013) ("[W]hen construing orders and judgments, effect must be given to that which is clearly implied, as well as to that which is expressly stated."). So perhaps the trial court's order should be read as finding that such abuse did occur.

To the extent that the trial court's order should be read as finding that abuse occurred, the basis for this finding is not specified. From our review of the record, we conclude that the finding regarding physical and sexual abuse must refer to the incident in which Mother felt pressured to have sex, and initially consented to having sex, soon after being cleared for sexual activity by her doctor, and withdrew consent during the act; Father, however, ultimately did not stop. Like the trial court, we are troubled by Father's conduct toward Mother as it relates to this incident. Mother's testimony, which the trial court clearly credited, shows that this not entirely consensual encounter was particularly traumatic for Mother. We therefore cannot condone Father's behavior.

- 22 -

But the proof also shows that Mother herself did not allege that this incident constituted "marital rape," as characterized by the trial court. Nor did she in any way characterize it as "violent." Moreover, this was a single, isolated incident in which Father used poor judgment. Mother made clear that there were no other incidents in which physical force or physical coercion was used against her in any manner whatsoever. And Mother thereafter chose to remain in the relationship with Father. In fact, even after the separation, Mother continued to seek reconciliation with Father.

In less fraught circumstances, we have often held that single incidents of poor behavior should not be used as dispositive factors in parenting decisions, as no parent is perfect. In particular, in the context of a finding of a material change in circumstances, we have explained that we are typically "disinclined to allow a single incident to serve as the basis for changing a primary residential parent designation" because

> [a]n apparently isolated episode of poor judgment . . . is insufficient to establish a material change of circumstance. If that were the case, no parent ever would be able to maintain custody of his or her children as parents are inherently human and fallible. A parent is not required to be perfect or error free in his/her parenting in order to avoid there being a material change of circumstances.

*Skowronski v. Wade*, No. M2014-01501-COA-R3-CV, 2015 WL 6509296, at *6 (Tenn. Ct. App. Oct. 27, 2015) (quoting *Beckham v. Beckham*, No. M2007-02863-COA-R3-CV, 2009 WL 690692, at *12 (Tenn. Ct. App. Mar. 13, 2009)).

The trial court's finding of mental abuse has even less support in the record. Once again, the trial court's order does not specify what conduct on the part of Father constituted mental abuse. As such, we are essentially left to guess as to what conduct this finding relates to. *See In re Joseph H.*, No. M2014-01765-COA-R3-JV, 2015 WL 5032066, at *2 (Tenn. Ct. App. Aug. 25, 2015) (quotation marks and citation omitted) ("[I]n the absence of findings of fact and conclusions of law [as mandated by Rule 52.01 of the Tennessee Rules of Civil Procedure], this court is left to wonder on what basis the court reached its ultimate decision."). As we perceive it, this finding likely relates to Mother's testimony about the Bible verses left for her around the house and Father pressuring her to have sex.[12] But once again, the trial court characterizes this conduct differently than Mother, as she admitted that she was unclear as to the motivation for Father's conduct. As such, it is something of a stretch to label this particular conduct mental abuse.

From our meticulous review of the record, it would take multiple such inferential leaps to arrive at the conclusion that Father abused Mother. If the trial court indeed drew

---

[12] Perhaps the trial court based its finding regarding sexual abuse on this conduct, as well, but, again, its reasoning as to the findings with respect to abuse is profoundly unclear.

- 23 -

such inferences from the testimony, including based on its credibility determinations, it should have explained as much. *See Van Tran v. State*, 6 S.W.3d 257, 271 (Tenn. 1999), *abrogated on other grounds by State v. Irick*, 320 S.W.3d 284 (Tenn. 2010) (citation omitted) ("[I]n the written findings of fact, the trial court shall set out any undisputed facts [and] explain its assessment of the credibility of the various expert witnesses and their conflicting opinions[.]"); *Orman v. Williams Sonoma, Inc.*, 803 S.W.2d 672, 677 (Tenn. 1991) (declining to defer to the trial court's finding that the plaintiff's testimony was not credible because the trial court set forth no reasons for such a finding and the record did not otherwise demonstrate a basis for this finding); *In re Lennon R.*, 2019 WL 2226007, at *4 ("[T]he better practice would have been for the trial court to explain the reasons for its credibility finding[.]"); *Small v. Small*, No. M2009-00248-COA-R3-CV, 2010 WL 334637, at *23 (Tenn. Ct. App. Jan. 28, 2010) ("We are particularly concerned with the court's seemingly cavalier treatment of . . . witnesses called on behalf of Husband, whose testimony the court disregarded without substantial explanation[.]").

So it appears that the trial court may have found that factor two heavily favors Mother based in large part on a single instance of, admittedly, very poor conduct on Father's part. But the trial court's order does not indicate how this conduct in any way affected Harper or either parent-child relationship. *See Cummings*, 2004 WL 2346000, at *8 n.5 (citing *Mimms*, 780 S.W.2d at 745). Certainly, the proof shows that Harper is bright, well-adjusted, bonded to both parents, and each parent generally attempts to facilitate her relationship and bond with the other. Moreover, while Mother shares no blame whatsoever with regard to the incident involving her withdrawing consent, Mother admittedly hoped to keep the relationship alive even following Father's conduct. Thus, the proof suggests that she did not have qualms about Father's ability to parent notwithstanding this single incident, as her testimony also demonstrates. Indeed, Mother agreed to an equal parenting arrangement with Father when they separated. But the trial court's finding essentially discounts Father's role in the child's life, which for over two years was largely equal to Mother's. On the whole, we cannot agree that this incident is evidence that Father cannot or will not facilitate a close and loving relationship between Harper and Mother. Instead, the evidence shows that the parties have been able to effectively co-parent, notwithstanding a few instances of intractable behavior on the part of both parents. Given this long history of effective co-parenting and the strong bond that both parties undisputedly share with the child, we must conclude that this factor is equal.

On factor five, the trial court's findings were as follows:

The Court acknowledges that [] Father does care for the child. However, the Mother has been the primary caregiver as it pertains to the minor child.

While [] Father has, on occasion, taken the child to scheduled doctor appointments during his coparenting time, the Mother has performed the

greater responsibility for performing parenting tasks. Therefore, Mother has been the primary caregiver for the minor child.

This factor weighs in [] Mother's favor.

*See* Tenn. Code Ann. § 36-6-106(a)(5) (involving which parent has been the primary caregiver). Our same analysis under factor one applies here: Mother is slightly more of a primary caregiver to Harper. Thus, this factor weighs slightly in her favor.

As to factor seven, the trial court found:

This factor weighs in favor of [] Mother. The minor child is young and, as all children, needs a routine. [] Mother testified as to the specific routine and care she provides for the child. [] Father's schedule varied greatly for the child. Due to the child's age and need for a consistent routine, this factor weighs slightly in favor of [] Mother.

*See* Tenn. Code Ann. § 36-6-106(a)(7) (regarding the child's emotional needs and developmental level). It appears that Father's schedule may indeed vary more than Mother's, to the extent that he takes Harper to more and later outings. However, just because divorced parents have different parenting styles does not mean one is necessarily better. *See, e.g.*, **Gratton v. Gratton**, No. M2004-01964-COA-R3-CV, 2006 WL 794883, at *5 (Tenn. Ct. App. Mar. 28, 2006) ("The evidence showed that both parents have a warm, attentive and loving relationship with the child. To be sure, their parenting styles are different, but we cannot conclude based on the evidence that Father's parenting is superior[.]"). Nor did the trial court explain how Father's routine, or lack thereof, negatively affected Harper. The only evidence to that effect, besides Mother's conclusory opinion that Father's lack of routine is not good for Harper, was Mother's testimony that Harper is often tired upon returning from Father's care. However, Father introduced logs he kept of his daily activities with Harper in evidence, spanning from the time the parties separated through April 2017, and then again from the time Mother filed for divorce until June 2019. The latter set of those logs indicates that Father parented Harper with a certain level of structure, including roughly consistent bedtimes. Moreover, Mother admitted at the first hearing that she did not really know Father's routine, despite her speculation that he lacked one. She also acknowledged that the continuity of Harper's life is being maintained, that Father has been properly caring for Harper, and that she could not say that Harper was never up past 8:00 PM in her care. Therefore, Mother's irresolute testimony is insufficient to discredit the evidence Father provided of how he parents Harper with some general structure and consistency, albeit perhaps not up to Mother's subjective standards. Thus, this factor is equal.

The trial court's findings regarding factor eight are as follows:

> This factor weighs heavily in favor of [] Mother.
>
> [] Father admittedly had issues with pornography. [] Mother also testified as to instances of unwanted and unsolicited advances to [] Mother during the course of the marriage. [] Father further showed a lack of maturity and fitness by taking the child to his work place and a ballgame while the child was sick.
>
> Further, [] Father's use of the ordered co-parenting plan as a weapon and to spite [] Mother affects his ability to co-parent equally.

*See* Tenn. Code Ann. § 36-6-106(a)(8) (involving each parent's moral, physical, mental and emotional fitness of each parent as it relates to their parenting abilities). As previously discussed, the trial court's finding as to Father's weaponization of the temporary parenting plan is not supported by the evidence presented. We will therefore not repeat our conclusions and analysis as to that issue. While we cannot say the trial court is wrong to question Father's decision to take Harper out when she was sick, it was also a singular instance, where, per Mother, he ultimately took her home, apparently earlier than planned, and to the doctor.

As to the issues regarding pornography and sex, again, there was no evidence that Harper has been affected by those in any way. In fact, the undisputed testimony regarding Father's pornography usage was that it has had no effect on Harper whatsoever. This factor relates to a parent's fitness "*as it relates to their ability to parent the child*." *Id.* (emphasis added). In a similar case, this Court was called upon to review a trial court's restriction of a father's parenting rights under a parenting plan because it had "concerns re: Father's penchant for pornography" and other sexual activity. *See **Petty v. Petty***, No. E2004-01421-COA-R3-CV, 2005 WL 1183149, at *1 (Tenn. Ct. App. May 19, 2005). We explained that "[i]n ***Parker v. Parker***, 986 S.W.2d 557, 563 (Tenn. 1999), the Tennessee Supreme Court acknowledged that 'sexual indiscretion does not, by itself, disqualify a parent from being awarded custody, but it may be a relevant factor if it involves the neglect of the child.'" *Id.* at *5 (citation omitted). In ***Petty***, as in the case-at-bar, "no proof [was] presented . . . that any of the activities ascribed to [the f]ather ha[d] affected his relationship with his children or that his children ha[d] been, or w[ould] be, exposed to any material which has been designated 'pornographic.'" *Id.* Also as in this case, to whatever extent the father in ***Petty*** engaged "in the activities objected to, he d[id] so outside of the presence of his children and there [wa]s no proof that his children [we]re ever exposed to any of these activities. Nor [wa]s there proof that any of these activities affect[ed] [his] relationship with his children in any way whatsoever." *Id.* Therefore, this Court modified the trial court's judgment to reverse the restrictions it placed on the father's parenting rights. *Id.* at *1; *see also id.* at *5 ("[N]o expert proof was submitted by [the m]other to support the trial court's statement that the activities engaged in by [the f]ather 'can be addictive . . . .' and we do not find this to be a proper matter for judicial notice."). Thus, the same conclusion follows here: because the proof was undisputed that Father's pornography habit and the issues

involving Mother and Father's sexual relationship had no effect whatsoever on Harper, the trial court was in error in relying on these matters as proof of a lack of moral or mental fitness as it relates to his parenting Harper. Removing this consideration, we must conclude that this factor actually weighs equally in each party's favor.

As to factor ten, that trial court found the following:

This factor weighs slightly in favor of [] Mother.

[] Mother resides in the marital home and the only home the child has known.

[] Father does have a satisfactory living environment however, as previously stated, he has a lack of consistent routine with the minor child.

*See* Tenn. Code Ann. § 36-6-106(a)(10) (involving the importance of continuity and how long the child has lived in a stable environment). Our previous analysis regarding Harper's routine applies here. Additionally, the trial court's finding that Mother's home is "the only home the child has known" is, simply, incorrect. Harper has lived with Father at his parents' house during his parenting time, which has been substantial. The trial court also offers no explanation for why Mother's home is more stable, when it expressly found that Father's living environment is satisfactory. An inevitability of divorce is that children will have to live in more than one home. That is not adequate reason to limit parenting time. *See **Krulewicz v. Krulewicz***, No. M2021-00190-COA-R3-CV, 2022 WL 287811, at *11 (Tenn. Ct. App. Feb. 1, 2022) ("[U]nfortunately some disruption in children's lives is inevitable in divorce."); ***Taylor v. Taylor***, 849 S.W.2d 319, 330 (Tenn. 1993) (citation omitted) ("Adjustments and accommodations must be made as a result of the divorce, the whole point of which was to permit each parent to go his or her own way. Within reason, both parties must be permitted to do so, and the child's best interests must be served within that context."). Therefore, because there is no evidence that Father's home is unstable, this factor is equal.

The trial court made the following findings on factor fourteen:

This factor weighs in favor of [] Mother.

[] Father's work schedule is flexible. [] Mother's work schedule is somewhat more stringent as a teacher but is accommodating for child rearing.

This factor could weigh in favor of both parties, except that [] Father demanded a stringent early drop off daycare schedule despite his testimony about being allowed to be flexible with his work schedule for co-parenting.

> During the time that the Court awarded [] Father a trial period of significant and almost equal parenting time [] Father continued with the status quo of waking the child early for daycare. The Court finds that [] Father did not use or take advantage of the flexibility in his work schedule that he testified he was allotted.
>
> Therefore, this factor weighs in favor of [] Mother, although [] Father had the ability to utilize flexibility in his work schedule, he did not.

*See* Tenn. Code Ann. § 36-6-106(a)(14) (involving the parents' employment schedules).

Again, we reiterate that a parent's choice to have a slightly different schedule for a child than the other parent does not necessarily mean that one schedule is superior. *See **Gratton***, 2006 WL 794883, at *5. Further, Mother testified that Father had always waked early. Thus, it appears that his choice to drop Harper off at daycare early, even if earlier than necessary for him to arrive at work on time, does not indicate a significant deviation from his usual schedule. Moreover, Mother did not testify regarding specific times she wakes Harper versus when Father wakes Harper —she only took issue with the drop off times. From our review of some of the daycare sign-in sheets,[13] it appears that Mother would generally drop Harper off between approximately 7:15 and 7:45 AM, and Father would generally drop her off around 6:30 AM, although on a few occasions each parent deviated slightly from those times. This seems to basically line up with the parties' testimony. There may be some validity to Mother's preference for a later drop off. But there is no clear evidence in the record that Father's early drop off schedule inflicted harm on Harper, including any testimony from Ms. Orean that would indicate Harper was suffering in any way when she would arrive early at daycare. Again, the main concern in fashioning parenting schedules is the child's welfare. *See **Shofner***, 181 S.W.3d at 715–16. Rather, the general undisputed testimony is that Father's work schedule is flexible enough to allow him to take care of Harper. Therefore, this factor is equal.

Finally, the trial court stated that it deemed no other factors relevant, despite the allowance in section 36-6-106(15) to consider other relevant factors. However, as explained *supra*, the trial court considered Harper's age, erroneously relying on the tender years doctrine. The trial court also relied on Harper's gender in an impermissibly conclusory manner, as explained *supra*.

We therefore agree with Father that the trial court erred in much of its best interest analysis. In light of our consideration of the best interest factors and the statutory instruction to maximize each parent's time, we also conclude that the trial court erred by failing to maximize Father's parenting time. "[T]hese parents, like all parents, have their own strengths and weaknesses." ***Shofner***, 181 S.W.3d at 716 (citing ***Gaskill v. Gaskill,*** 936

---

[13] Some of these are illegible due to poor copy quality.

S.W.2d 626, 630(Tenn. Ct. App. 1996)). "It would be unrealistic to measure them against the standard of perfection because, in reality, this standard is unattainable." *Id.* As our analysis of the best interest factors demonstrates, while each parent has drawbacks, "we have not found evidence indicating that either parent is unfit." *Id.* at 717. "No evidence was introduced that put Father's parenting skills at issue, and no evidence was introduced to indicate that Mother was a better parent." *Gooding*, 477 S.W.3d at 784.

Here, the trial court's parenting plan is "notably lop-sided." *Barnes*, 2012 WL 5266382, at *8. "We recognize that, in some instances, such a parenting schedule may be necessary to fit the child's needs, which are paramount." *Id.* However, the evidence is clear that each party is a good parent and has a good relationship with Harper, whatever their personal or relational issues may be. Moreover, the parties shared equal time by agreement for twenty months before the court entered its temporary order, which then afforded the parties almost equal time for roughly seven months. Yet, the trial court ultimately limited Father's time to 120 days, giving Mother 245 days. While courts "shall not draw any presumptions from [a] temporary parenting plan," Tenn. Code Ann. § 36-6-406(e), when a temporary parenting plan is in place for a long time, courts may consider that when determining the details of a permanent plan. *See Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *6 (Tenn. Ct. App. July 21, 1999) (quoting *King v. King*, No. 01-A-019110PB00370, 1992 WL 301303, at *2 (Tenn. Ct. App. Oct. 23, 1992)) (discussing, in a change of custody case, how the Court could not ignore that the children had been with one parent for an "extended period" under a temporary parenting plan, and how "temporary custody, when permitted to continue over a long period, creates a 'new status quo'"); *see also Shofner*, 181 S.W.3d at 718 (citations omitted) ("The fact that the parenting plan at issue in this case has been in place since September 2002 has influenced our analysis of the issues in this case. Children have the best opportunity to thrive when they live in stable environments.").

Additionally, the fact that the trial court ultimately adopted a parenting plan that afforded Father fewer parenting days than Mother proposed "is noteworthy." *Barnes*, 2012 WL 5266382, at *8; *see also id.* (citing *Greer v. Greer*, No. W2009-01587-COA-R3-CV, 2010 WL 3852321, at *7 (Tenn. Ct. App. Sept. 30, 2010)) ("While the trial court is not bound by a parenting arrangement on which the parties have agreed, it may legitimately take such an agreement into account."). "For reasons unexplained by the record, the trial court did not make findings to . . . state why a substantial reduction in [Father's] parenting time from [Mother's] plan was in [Harper's] best interests." *McDaniel v. McDaniel*, No. M2012-01892-COA-R3-CV, 2013 WL 3958388, at *3 (Tenn. Ct. App. July 29, 2013).

"With the restrictions on Father's parenting time, it cannot be said that he is able to enjoy the 'maximum participation possible' in his child's life." *In re Grace N.*, No. M2014-00803-COA-R3-JV, 2015 WL 2358630, at *5 (Tenn. Ct. App. May 14, 2015). And in light of our analysis of the best interest factors, the fact that Mother was willing to afford Father more days than the trial court ultimately ordered, and the parties successfully

parented essentially equally for an extended period, the trial court did not have a justifiable reason for thusly restricting Father's parenting time. "Considering the above, we are unable to conclude that the parenting schedule adopted by the trial court is in the best interests of the children." *McDaniel*, 2013 WL 3958388, at \*4. Therefore, and in light of "the fact that the General Assembly has established the aspirational goal for the courts to maximize each parent's participation in the life of the child," *see* Tenn. Code Ann. § 36-6-106(a), "we reverse and remand with instructions for the trial court to establish a parenting schedule that maximizes each parent's participation in the life of the child." *Gooding*, 477 S.W.3d at 784.

"[W]e are cognizant that '[i]t is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court.'" *In re Lennon R.*, 2019 WL 2226007, at \*14 (citing *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001))). However, "we conclude that the trial court abused its discretion because it reached an illogical conclusion when it awarded [Father] only [Thursday and] every other weekend with" Harper. *Id.* "As discussed above, the evidence does not support such a custody arrangement. It is clear that such an arrangement would not be in [Harper's] best interest. Due to [her] bond with both parents, significantly truncating her time with either would likely cause [Harper] distress." *Id.* Accordingly, on remand, the trial court should "fashion a more equal parenting schedule between the parties" in light of the concerns raised in this Opinion. *Id.* (citing *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *Armbrister*, 414 S.W.3d at 693)).

## B. ALIMONY

As our supreme court has explained, "in determining whether to award spousal support and, if so, determining the nature, amount, length, and manner of payment, courts consider several factors," which are outlined in Tennessee Code Annotated section 36-5-121(i). *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 109–10 (Tenn. 2011). "Although each of these factors must be considered when relevant to the parties' circumstances, 'the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay.'" *Id.* at 110 (citations omitted). "Carefully adhering to the statutory framework for awarding spousal support, both in terms of awarding the correct type of support and for an appropriate amount and time, fulfills not only the statutory directives but also alimony's fundamental purpose of eliminating spousal dependency where possible." *Id.*

Additionally, under Rule 52.01 of the Tennessee Rules of Civil Procedure, "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." "The underlying rationale for this mandate is that it facilitates appellate review by 'affording a reviewing court a clear understanding of the basis of a trial court's decision,'

- 30 -

and in the absence of findings of fact and conclusions of law, 'this court is left to wonder on what basis the court reached its ultimate decision.'" ***Gooding***, 477 S.W.3d at 782 (citations omitted). "Simply stating the trial court's decision, without more"—as the trial court did here—"does not fulfill [Rule 52.01's] mandate." ***Barnes***, 2012 WL 5266382, at *8.

Unfortunately, the entirety of the trial court's ruling on alimony in this case was as follows: "The Court hereby indicated that a little alimony for a short period of time should be awarded and hereby orders that [Father] pay transitional alimony in the amount of $500.00 per month for a period of two (2) years." Even after amending its orders multiple times, the trial court did not expound upon this determination. Therefore, it appears that the trial court did not properly consider the above alimony factors. It also failed to comply with Rule 52.01 by "[s]imply stating [its alimony] decision, without more." ***Id.***

Consequently, we vacate the trial court's award of alimony to Mother and remand for the trial court to engage in the proper analysis and considerations regarding alimony, and to enter an order that properly explains its alimony decision. *See, e.g.*, ***Brainerd v. Brainerd***, No. M2015-00362-COA-R3-CV, 2016 WL 6996365, at *6 (Tenn. Ct. App. Nov. 30, 2016) (citing ***Donaldson v. Donaldson***, No. M2015-01035-COA-R3-CV, 2016 WL 3662305, at *4 (Tenn. Ct. App. June 30, 2016) (vacating and remanding an alimony award when trial court made insufficient findings with respect to need)) ("[W]e vacate the award of [] alimony and remand for reconsideration of the type, duration and amount of alimony, if any, to be awarded and for the entry of sufficient findings of fact and conclusions of law.").[14]

## C. ATTORNEY'S FEES ON APPEAL

Each party requests attorney's fees incurred on appeal in the argument sections of their briefs. "Under Tennessee Code Annotated section 36-5-103(c), '[a] prevailing party may recover reasonable attorney's fees' in suits involving changes in child custody. Tenn. Code Ann. § 36-5-103(c)." ***In re Lennon R.***, 2019 WL 2226007, at *15. "[I]t is left to this Court's sound discretion whether to award such fees." ***Id.*** (citation omitted). However, neither party specifically designates appellate attorney's fees as an issue presented on

---

[14] Father does not outright ask this Court to remand this case to a different trial judge, but suggests that to remand to the original trial judge would be problematic. However, recusal of the trial judge was not designated as an issue on appeal, nor was a recusal motion ever filed. *See* ***Kinard v. Kinard***, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998) (citations omitted) ("[R]ecusal motions must be filed promptly after the facts forming the basis for the motion become known, and the failure to assert them in a timely manner results in a waiver of a party's right to question a judge's impartiality."). Moreover, the vague insinuations in Father's brief are not sufficient to warrant disqualification of the trial judge on remand. *See* ***Biggs v. Town of Nolensville***, No. M2021-00397-COA-R3-CV, 2022 WL 41117, at *5 (Tenn. Ct. App. Jan. 5, 2022) (rejecting an appellant's argument that the matter should be reassigned on remand because the trial court's adverse rulings were not sufficient to justify disqualification).

appeal. "[A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)." *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012). Therefore, we conclude that each party has waived this issue.

## CONCLUSION

The judgment of the Domestic Relations Court of Meigs County is reversed in part and vacated in part. This cause is remanded for further proceedings consistent with this Opinion. Costs of this appeal are assessed to Appellee Megan Arndst Woody, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE